BENJAMIN H. READ, trading as Lynah & Read,

*vs.*

THE TIDEWATER COAL EXCHANGE, INC., a dissolved corporation of the State of Delaware.

*New Castle, April* 20, 1922.

Under the *General Corporation Law*, § 5, *Paragraph* 4 (*Revised Code* 1915, § 1919), making requirements as to capital stock inapplicable to corporations "not for profit for which it is desired to have no capital stock," a corporation may be organized without capital stock though not of charitable, social, religious, or eleemosynary character, in view of *Section* 1 (*Section* 1915), and notwithstanding *Section* 127, as amended (*Section* 1985), and *Revised Code* 1915, § 103, as amended by *Act General Assembly* March 8, 1915 (28 *Del. Laws, c.* 9), and *Revised Code* 1915, § 105, since the term "profit" means acquisition beyond expenditure or the excess of sale or value received over cost, and the test as to whether a corporation is organized for profit is whether the corporation expects to pay dividends.

Shippers, transshippers, and consignees of coal at the tidewater ports of New York, Philadelphia and Baltimore could organize a corporation to aid the movement of coal at tidewater without the issuance of stock by the corporation, where the corporation handled no money except such as was necessary to pay the cost of operation, conducted no business for itself, and engaged in no transactions that contemplated a profit for itself, the corporation not having been organized for "profit" under *General Corporation Law*, § 5, *Paragraph* 4, (*Revised Code* 1915, § 1919), making requirements as to capital stock inapplicable to corporations not organized for "profit."

A corporation is organized for profit within the meaning of *Section* 5, *Paragraph* 4, (*Revised Code* 1915, § 1919) of the *General Corporation Law*, when its purpose is, whether dividends are intended to be declared or not, to make a profit on the business it does which in reason belong to it and which if its affairs are administered in good faith would be available for dividends.

"Profit" within the meaning of the above section must be something of a tangible and pecuniary nature, belonging to, or expected to come into the possession of, the corporation *qua* such as distinguished from its members or stockholders.

Failure of certificate of corporation organized without capital stock to state the conditions of membership as required by *General Corporation Law*, § 5, *Paragraph* 4 (*Revised Code* 1915, § 1919), did not invalidate the incorporation proceedings, but merely deprived the corporation of its character as a *de jure* corporation, and made it a *de facto* corporation.

Certificate of incorporation stating that members should be incorporators, and such other persons as may become members in the manner provided by the by-laws, and requiring the members to observe the requirements of the by-laws on penalty of forfeiture, and stating that all members should stand on an equal footing with respect to voting power and property right, and that no member might assign or transfer his membership, *held* a compliance with *General Corporation Law,* § 5, *Paragraph* 4 (*Revised Code* 1915, § 1919), requiring the certificate of incorporation of a corporation without capital stock to state the conditions of membership.

RULE TO SHOW CAUSE WHY RECEIVERS SHOULD NOT BE DISCHARGED. A petition was filed against the Tidewater Coal Exchange, Inc., averring that the defendant was a corporation, existing under the laws of this state, that it had been duly dissolved, that a certificate of dissolution had been issued by the Secretary of State, and praying that the Chancellor appoint receivers for the corporation. The petition was filed under the provisions of *Section* 43 of the *General Corporation Law* of this state [*Section* 1957 (*Section* 43, *Chapter* 65), *Revised Code* of 1915], which is, as follows:

"1957. *Section* 43. *Dissolved Corporations; Receivers for; How Appointed*; *Powers.*—When any corporation organized under this chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor or stockholder of such corporation, at any time, may either continue such directors, trustees as aforesaid, or appoint one or more persons to be receivers of and for such corporation, to take charge of the estate and effects thereof, and to collect the debts and property due and belonging to the company, with power to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary or proper for the purposes aforesaid, and to appoint an agent or agents under them, and to do all other acts which might be done by such corporation, if in being, that may be necessary for the final settlement of the unfinished business of the corporation; and the powers of such trustees or receivers may be continued as long as the Chancellor shall think necessary for the purposes aforesaid."

Answer was made to the petition admitting all its allegations. Thereupon the Chancellor appointed receivers as prayed.

Thereafter a petition was presented by Charles W. Hendley, trading as C. W. Hendley & Co., a member of the Tidewater Coal Exchange, Inc., praying an order upon the receivers to pay to the petitioner certain moneys claimed to be due him. On the presentation of this petition a rule was directed to the receivers

and to all members and creditors of the Exchange, directing them to appear on a designated day and show cause, if any they had, why the prayer of the petition should not be granted.

On the return of the rule, L. C. Smith & Bros. Typewriter Company, a creditor, averred on information and belief "that the said Tidewater Coal Exchange, Inc., was conducted for the profit of its members, and was not lawfully organized under the said laws of the state of Delaware," that as a consequence the members of the Exchange constitute a partnership and not a body corporate.

Upon the reading of this averment, the Chancellor directed the hearing on the Hendley petition to stand over to a date later to be fixed, and, at the same time, because of the question as to the jurisdiction of the court to appoint the receivers which the L. C. Smith & Bros. Typewriter Company had by its answer raised, ordered a rule on the receivers and all members and creditors of the Exchange to show cause why the receivers heretofore appointed should not be discharged.

This rule came on to be heard on the original petition and answer, the petition of C. W. Hendley & Co., and the answers filed thereto, and is the matter now before the court for disposition.

*Sylvester D. Townsend, Jr.*, and *James I. Boyce*, for the rule.

*Herbert H. Ward*, of the firm of Ward, Gray and Neary, and *William S. Hilles*, and *Gibbs L. Baker*, of Washington, D. C., opposed.

THE CHANCELLOR. The points made against the propriety of the appointment of the receivers are, as stated on the brief of the solicitors for L. C. Smith & Bros. Typewriter Company:

1. That the said the Tidewater Coal Exchange, Inc., was not incorporated under the laws of the state of Delaware:

(a) Because it was illegal to attempt to incorporate such an organization "not for profit."

(b) Because the alleged charter failed to state the conditions of membership in the alleged corporation.

2. That the alleged incorporation was a mere nullity for failure to come within, or to comply with, the laws of the state of Delaware.

3. That being a mere nullity, the attempted incorporation did not create either a corporation *de jure* or *de facto*.

4. That in the absence of even a corporation *de facto* the members of the association are individually liable as partners.

Preliminary to a consideration of the points of law thus made, it is advisable to first make a statement of the nature of the activites in which the Exchange became engaged. The certificate by which it claims to be entitled to a corporate franchise under the laws of this state was filed with the Secretary of State on April 12, 1920. Prior to that time an unincorporated association bearing a similar name had been in existence since the latter part of the year 1917. This unincorporated association had been formed for the purpose of aiding in the movement of coal at tidewater in the most expeditious manner. Its operations were under the direction of certain railroads, whose purpose it was to relieve congestion of coal at tidewater, and thereby release cars for immediate return to the mines. This was a great disideratum at that time because of the special stress and strain of circumstances occasioned by the World War. Because of the highly meritorious purpose thus sought to be subserved by the unincorporated association, it appears that membership in it was, during a large period of its operations, made compulsory by an order of the Fuel Administration of the United States Government. After the war was ended, the work done by the unincorporated association having proved so efficacious, it was manifestly desired by those who were interested in tidewater coal and its convenient handling to continue an organization similar in character, whose function it would be to render a similar service.

Accordingly, such an organization was formed, and a certificate filed under the laws of this state seeking its incorporation. Such certificate was received and filed by the Secretary of State on April 12, 1920. The new organization took the corporate name of "The Tidewater Coal Exchange, Inc." While the fact of the corporate existence of this organization is attacked, yet for convenience I shall, in referring to it, speak of it as a corporation.

The certificate contains the following three paragraphs which are pertinent to be considered in connection with the question now in controversy before the court:

"Third.  The nature of the business and objects or purposes proposed to be transacted, promoted or carried on are:

"(a)  To inspect, grade, classify, and pool coal of all classes and character on a just and uniform basis.

"To foster the business of coal producers, coal distributors and coal consumers in the transshipment of coal at tidewater; to reform abuses with respect thereto: to secure freedom from unjust or unlawful exactions with respect thereto; to promote uniformity and certainty in the method of conducting the transshipment of coal at tidewater; to settle all differences in respect thereto between members of this corporation; to promote the economical and easy transshipping of coal at tidewater in all respects in order to lessen the cost of producing, distributing, and consuming coal and to release promptly railroad facilities in order that the production of coal shall be increased.  To promote and encourage a closer and more friendly relation between the producers, distributors and consumers of coal transshipped at tidewater; to diffuse accurate and reliable information as to all matters and things pertaining to the transshipment of coal at tidewater.

"(b)  To co-operate through membership or otherwise, with any other tidewater transshipment organization instituted for mutual help and not conducted for profit.

"(c)  To acquire by grant, gift, purchase, devise or bequest, and to hold and dispose of such property as the purposes of the corporation shall require, subject to such limitations as may be prescribed by law, for the benefit of the members and not for pecuniary profit.

"(d)  To borrow money of any person, firm or corporation and to issue bonds, debentures or obligations of this corporation from time to time, for any of the objects or purposes of the corporation and to secure the same by mortgage, pledge, deed of trust or by any other lawful means and to take and receive notes, bonds, mortgages, deeds of trust, or any evidence of indebtedness for the use and benefit of the corporation.

"(e)  To apply for, take out, acquire, own, use and dispose of trademarks, copyrights and patents necessary, convenient or desirable for furthering any of the purposes for which this corporation is formed, and to make rules and regulations with reference to the use thereof, and from time to time to change, modify or repeal such rules and regulations.

"In general to carry on any other operations in connection with the foregoing, and to have and to exercise all the powers conferred by the laws of Delaware upon corporations formed under the act hereinafter referred to, and to do any or all of the things hereinbefore set forth to the same extent as natural persons might or could do.

"The foregoing clauses shall be construed both as objects and powers; and it is hereby expressly provided that the foregoing enumeration of specific

powers shall not be held to limit or restrict in any manner the powers of·this corporation.

"Fourth. This corporation is instituted for the purpose of mutual.help in the accomplishment of the purposes hereinbefore set forth. It shall have no capital stock and shall not be conducted for profit. The members of·this corporation shall consist of the persons hereinafter named as incorporators and such other persons as from time to time hereafter may become members in· the manner provided by the by-laws.

"Any member who shall fail to comply with the requirements of the by-laws or the rules and regulations made pursuant thereto shall, if the board of directors by majority to vote so determine, forfeit his membership and any and all rights and interest in this corporation and its property.

"Fifth. The voting power and the property rights and interest of all members shall be equal. Each membership shall be entitled to one vote on any and all questions coming before the members. Every member of the corporation entitled to vote at any meeting of the members, may be represented and vote by proxy. A certificate of membership shall be issued to each member. No membership or certificate of membership shall be transferable, and no assignee or transferee thereof, whether by operation of law or otherwise, shall be entitled to membership in this corporation or to any property rights or interests therein."

After filing and recording the certificate as provided by law, the corporation was duly organized. Being a corporation claiming to be organized not for profit, as was stated in the certificate, it· had no capital stock. Its members were shippers, transshippers and consignees of bituminous coal at the tidewater ports of New York, Philadelphia and Baltimore. How numerous its membership was, the record before me does not disclose. That the membership was very substantial is apparent, however, from the great volume of transactions passing through its management. Its directors were twenty-seven in number. Without going into the. detail of its operations, it is sufficient to state simply its general· plan. This centralized around the chief purpose of classifying all· coal reaching tidewater, segregating it into several pools arranged according to·grade, and rendering it quickly available to all members for immediate loading into ships. The coal was consigned by the members to the Exchange, which credited the respective members with the tonnage supplied by them to the various pools. Each member was permitted to draw coal from the pools under the rules and supervision of the. Exchange. If·a member.

who·was allowed to draw coal from any pool had no credit against that particular pool, then he became a debtor to the extent of the coal withdrawn and gave bond with surety for the return to the pool of coal in an amount sufficient to balance his account.· Coal was not bought nor dealt in by the Exchange. If any member, however, failed to supply coal debited against him by any pool, when the Exchange made demand therefor, the Exchange was authorized to purchase in the market a sufficient quantity to supply the member's default. The cost of coal so purchased was charged to the member on whose account it was purchased, and recourse could, of course, be had to the member's bond. Members took care of all freight charges. But the Exchange handled all matters connected with demurrage due the railroads. These demurrage charges were equitably adjusted and distributed by the Exchange among the members according as they were properly chargeable therewith. Bonds with surety also protected the Exchange against defaults in the payment of demurrage.

. The. Exchange handled no moneys except such amounts as were calculated to cover the actual net cost of its operations. These costs were met as follows: One-half was paid by certain railroads operating in the territory from which coal· was shipped to the tidewater ports mentioned, and the other half of the costs was paid by the members. The railroads entered into a contract by which they agreed to pay their one-half of the costs, and the members contributed their one-half in the form of initiation fees and dues. The Exchange acquired and possessed no property, except such as may be described as office equipment.

From the foregoing it appears that the Exchange was a sort of trade agency created and maintained by railroads and coal shippers, to assist in removing the general adverse conditions existing at tidewater, conditions which were, as is well known, causing great and alarming concern along the entire eastern seaboard.

In due time, after I suppose the emergent situation which occasioned its activities had passed and its *raison d'etre* had ceased, the corporation took steps under the law for its dissolution, and accordingly, on September 20, 1921, the Secretary of State issued his certificate of dissolution of the Exchange, re-

citing therein that the usual conditions precedent for the dissolution of Delaware corporations had been complied with.

Having made this brief outline of the nature and character of the activities which the Exchange undertook to engage in, I now proceed to examine the reasons advanced as to why the Exchange though possessing a certificate of incorporation issued under the General Corporation Law, and, though having gone through the process of dissolution under that law, is, nevertheless, not entitled in these proceedings to be regarded as a corporation existing under the laws of this state.

The second and third of the points noted at the outset will be disposed of in the discussion of the first, and will, therefore, receive no further reference.

1. The exchange is said not to be a corporation under the laws of this state because (a) it was illegal to attempt to incorporate such an organization "not for profit"; and (b) "because the alleged charter failed to state the conditions of membership in the alleged corporation."

(a) The argument in support of this contention necessitates a construction of *Paragraph* 4, § 5, of the *General Corporation Laws* (*Section* 1919 [*Section* 5, *c.* 65] *Revised Code* of 1915). That paragraph specifies the following as among the things which the certificate of incorporation shall set forth:

"4. The amount of the total authorized capital stock of the corporation, which shall not be less than two thousand dollars, the number of shares into which the same is divided and the par value of each share; the amount of capital stock with which it will commence business, which shall not be less than one thousand dollars; in the case of a corporation without nominal or par value to its stock or any class thereof, the certificate of incorporation, with respect to such stock, in lieu of the above shall state the total number of shares authorized and that they are without nominal or par value and the number of shares with which it will commence business, which shall not be less than ten shares; and if there be more than one class of stock created by the certificate of incorporation, a description of the different classes with the terms on which the respective classes of stock are created. Provided, however, that the provisions of this paragraph shall not apply to corporations not for profit, for which it is desired to have no capital stock; in case any such corporation desires to have no capital stock it shall be so stated, and the conditions of membership shall be also stated."

"*Section* 1 of the *General Corporation Law* (*Section* 1915 [*Section* 1, *Chapter* 65] *Revised Code* of 1915) provides that:

"Any number of persons, not less than three, may associate to establish a corporation for the transaction of any lawful business, or to promote or conduct any legitimate objects or purpose under the provisions of and subject to the requirement of this chapter as hereinafter provided.   *   *   *   "

That the objects and purposes sought to be promoted by the Exchange were legitimate and lawful is not, of course, disputed. It was entirely proper for the Exchange to become incorporated. But it is contended that in doing so, it was not lawful for the incorporators to bring themselves within the "no capital stock" clause of *Paragraph* 4, § 5, *supra*, that being, as is insisted, a corporation for profit, it was necessary for the proposed incorporation to provide for capital stock issues.   This contention requires an examination of the meaning of the phrase "not for profit" found in the quoted paragraph of the act.

Solicitors for L. C. Smith & Bros. Typewriter Company urge that the phrase "not for profit" has a well-defined meaning when used as descriptive of corporations.

"The phrase [quoting their brief] includes charitable, social, religious or eleemosynary organizations and excludes business, trading or commercial concerns."

They refer to the language of *Paragraph* 4, § 5, as it was originally enacted, and as it appears in *Chapter* 273, *Volume* 21, *Laws of Delaware* approved March 10, 1899.   The original language as found in that chapter is, as follows (quoting only the pertinent portion):

"   *   *   *   Provided, however, that the provisions of this paragraph shall not apply to religious or literary corporations, unless it is desired to have a capital stock; in case any religious or literary corporation desires to have no capital stock it shall be so stated, and the conditions of membership shall be also stated."

It will be observed, therefore, that the Legislature originally described corporations which might be incorporated without having any capital stock as "religious or literary corporations." This descriptive language was, however, later changed by amendment so as to read as now found in the law.   Whereas before, the law provided that "religious or literary corporations" could be

organized without capital stock, it now in lieu of such provision provides that corporations "not for profit" may be so organized.

From this circumstance it is argued that the inference is to be drawn that the Legislature intended by the phrase "not for profit" to mean only those corporations of a character similar to "religious or literary corporations," the kind which was originally specified.

I cannot agree with this contention. By the original language, religious and literary corporations were not required to have capital stock. The pursuit of profit was not the test by which the requirement of capital stock was determined. While it would be difficult to imagine a religious corporation as organized for profit yet it may well be conceived that literary corporations might be so organized. That being so, it would, therefore, appear that under the act as originally drawn the policy of the law with respect to dispensing with capital stock for corporations was not necessarily directed against the idea of profits. Originally, the corporations which might dispense with capital stock issues were designated by descriptive words of well-recognized import, and when these words were eliminated from the law and the words "not for profit" were introduced, an entirely new test with respect to whether capital stock could be dispensed with, was adopted. So that now a literary corporation, if it be organized for profit, cannot dispense with capital stock, though formerly it could. The idea, therefore, that corporations "not for profit" are to be regarded as synonymous with corporations for religious, literary or like purposes, is not tenable. Furthermore, if the change in the language of the act was designed to accomplish no more than is contended for by the solicitors for the L. C. Smith & Bros. Typewriter Company, it would have been more reasonable to expect the Legislature to have shaped its amendment in a different way. For instance, instead of striking out "religious or literary" and substituting therefor "not for profit," it would have been more consonant with the assumed legislative purpose to retain the original language and to add thereto such other words as "charitable," "social," etc., and then to have embraced all possible enumerated classes of a like kind by the employment of such words as "corporations of similar nature."

But, it is said, certain other provisions of the law of this state dealing with corporations indicate that the phrase "not for profit" appearing in the section now under consideration includes only such organizations as are charitable, social, religious or eleemosynary in character. These provisions are found in *Section* 127 of the *General Corporation Law,* found in *Chapter* 273, *Volume* 21, *Laws of Delaware* (*Section* 1985 [*Section* 71, *c.* 65] *Revised Code of* 1915), as amended by *Chapter* 166, *Volume* 22, *Laws of Delaware* and in *Section* 103 (*Section* 66 of *Chapter* 6) of the *Revised Code* as amended by *Chapter* 9, *Volume* 28, *Laws of Delaware,* and *Section* 105 (*Section* 68, *c.* 6) of the *Revised Code* of 1915.

The first reference is to *Section* 127, *c.* 273, *Volume* 21, *Laws of Delaware.* That section is a part of the general act under which this corporation was sought to be organized. It provides for the fees and taxes which shall be paid on the filing of any certificate of incorporation, or other papers relating to corporations in the office of the Secretary of State, with this *proviso,* viz.:

"That in case of corporations for religious, charitable or educational purposes, the tax shall not be charged or collected."

The tax mentioned is a tax graded on the amount of the capital stock authorized. Later the section was amended by *Chapter* 166, *Volume* 22, *Laws of Delaware,* so as to make the *proviso* read as it now appears in *Section* 1985 (*Section* 71; *c.* 65) *Revised Code of* 1915, viz.:

"That in case of corporations solely for religious or charitable purposes the tax shall not be charged or collected."

The act which thus amended the *proviso* of *Section* 177, *c.* 273, *Volume* 21, *Laws of Delaware,* in another of its sections amended *Section* 5, *Paragraph* 4, in the particular heretofore referred to, viz.: Substituting "not for profit" for "religious or literary."

Why the original and amended language of *Section* 127 of the *General Corporation Law,* as above set out, should indicate that the Legislature intended, when it adopted the amendment of allowing corporations "not for profit" to incorporate without capital stock, to restrict the privilege of so incorporating to only

such classes of corporations organized not for profit, as religious, literary, charitable, social, eleemosynary, or like corporations, I am unable to perceive. The only thing that the section dealt with was the subject of fees and taxes, and these were remitted originally in favor of "religious, charitable or educational corporations," and later, by the amendment referred to, in favor only of corporations organized "solely for religious or charitable purposes." I can gather nothing from this language and its history, of interpretative value in ascertaining the meaning of the phrase "not for profit" now appearing in *Section* 5, *Paragraph* 4, of the *General Corporation Law*. The state of the matter now is that the General Corporation Law provides that corporations "not for profit" may be organized with or without capital stock (*Section* 5, *Paragraph* 4), and that if any such corporations are "solely for religious or charitable purposes," then the taxes ordinarily required on filing a certificate shall not be charged or collected. If it be conceded that the legislative waiver of taxes in favor of any classes of corporations may legitimately serve to restrict the meaning of the legislative phrase "not for profit," where it is used in the section dealing with capital stock requirements, then it is reasonable to hold that such restricted meaning should keep within the limits of the tax waiving clause. In that event, corporations "not for profit" would be confined only to those which are organized "solely for religious or charitable purposes." Where would this leave literary and social organizations, which all sides agree are clearly to be included in the class of corporations organized "not for profit"? I am of the opinion that the section which remits taxes in favor of religious and charitable organizations can have no effect in delimiting the boundaries of the class of corporations falling within the descriptive phrase "not for profit," as employed in *Paragraph* 4 of *Section* 5 of the *General Corporation Law*.

And such is also my view with respect to the other provisions referred to, viz.: *Section* 103 (*Section* 66 of *Chapter* 6) *Revised Code of* 1915, as amended by *Chapter* 9, *Volume* 28, *Laws of Delaware*, and *Section* 105 (*Section* 68 of *Chapter* 6) *Revised Code of* 1915. These provisions were never a part of the so-called General Corporation Act, though the act embodying them was

passed by the same Legislature which enacted the General Corporation Act, and both were approved the same day, the one as *Chapter* 166, and the other as *Chapter* 273, *Volume* 21, *Laws of Delaware.  Section* 103, *Revised Code of* 1915 (originally *Section* 2, *c.* 166, *Volume* 21, *Laws of Delaware*), is a part of the chapter of the Code entitled "State Revenue," and the original act in which it is found was entitled "An act to raise revenue for the state by taxing corporations."  *Section* 105, *Revised Code of* 1915, above referred to (which has since its first enactment been amended), is likewise a part of the same chapter of the Code entitled "State Revenue," and is originally found as *Section* 4 of the same "Act to raise revenue for the state by taxing corporations."

*Section* 103, *Revised Code of* 1915, as amended, provides for the making of annual reports to the Secretary of State by corporations created under the laws of this state, setting forth certain specified data, and it further provides:

" * * * That in the discretion of the Secretary of State the filing fee may be remitted in the case of a charitable or beneficial organization, carried on without profit, or a corporation that is required to file a report with the Insurance Commissioner for which a fee is collected."

*Section* 105, *Revised Code of* 1915, prescribed the rates of the annual license fee, or franchise tax, to be paid by corporations, based in some cases on volume of receipts, and in others upon capital stock authorized.  The section contains a *proviso* that it shall not apply to certain corporations, viz.:

" * * * To railroad, railway, canal or banking corporations or to savings banks, cemeteries or religious corporations, or to purely charitable or educational associations or to any manufacturing, mining or mercantile corporations whose capital stock actually paid in is invested in a business carried on within this state, and which is subject to a license tax for the carrying on of said business," etc.

It is very clear that these provisions appearing in the Revenue Act have no connection whatever with *Section* 5, *Paragraph* 4, of the *General Corporation Law* (*Section* 1919 [*Section* 5, *c.* 65] *Revised Code of* 1915), so as to lend any aid in construing the language of the latter.  The act containing the latter is a statute enabling persons to form corporations.  The provisions of the Code above referred to are in their original form found in another act

whose subject-matter is of an entirely different nature, to-wit, the raising of revenue by taxation imposed on corporations. The two acts are in no sense *in pari materia*, and if they were I fail to see why the policy of allowing the Secretary of State in his discretion to remit a filing fee in cases where the corporation is charitable or beneficial in its nature and carried on without profit, or the policy of not imposing certain taxes upon numerous classes of corporations among which are found cemeteries, religious corporations and purely charitable or educational associations, can be said to be consistent with only one definition of the phrase "corporations not for profit," that one definition being, corporations which are religious, social, charitable, educational, literary or eleemosynary, as is contended by the solicitors who argue for the discharge of the receivers. The condition of the law with respect to corporations "not for profit" is that if they are organized, with or without capital stock, they need pay neither a filing fee to the Secretary of State if he remits it, nor need they pay annual license fees, or franchise taxes, if they can bring themselves within any of the excepted classes. If they cannot do this, even though they are conducted not for profit, and have no capital stock, they are treated like all other corporations in the particulars referred to so far as the same are applicable.

My conclusion on this branch of the case is that corporations not for profit may be organized without any capital stock, even though such corporations are neither religious, charitable, social, literary, educational or eleemosynary in nature. The test to be applied in each case, when the proposed corporation assumes to organize with no capital stock, is whether it is as a matter of fact conducted for profit. As I have endeavored to show, the statutes of this state, in their present condition, have introduced no criterion by which to judge whether a given corporation is to be regarded as of this class other than the fact of its existing for the purpose of making profits.

When may a corporation be said to be organized not for profit? Or, putting the converse of the question, when may a corporation be said to be organized for profit?

In the ordinary acceptation of the term "profit" means, as was said by the court in *Curry v. Warner Co.*, 2 *Marvel*, 98, 42

*Atl.* 425, "acquisition beyond expenditure, or the excess of sale or value received over costs." Our General Corporation Law in those provisions which deal with the declaration of dividends provide, expressly, or by inference, that such may be paid not only from surplus but also from "net profits", (*Sections* 1927, 1949 [*Sections* 13, 35, *c.* 65] *Revised Code of* 1915) or "accumulated profits" (*Section* 1948 [*Section* 34] *Id*). From this it is argued that a corporation organized for profit is one which expects to pay dividends, and 1 *Clark & Marshall on Private Corporations, p.* 83, is cited in support of this contention. There the following is found:

"A corporation for pecuniary profit is a corporation organized for the pecuniary profit of its stockholders or members. Banking corporations, manufacturing and trading corporations, railroad companies, water and gas companies, and the like, which pay or are expected to pay dividends, clearly come within this class."

In the same connection, this citation is taken from 1 *Fletcher's Cyclopedia of Corporations, p.* 92:

"Under the statutes of some states, separate provisions are made for the incorporation of corporations for pecuniary profit, as distinguished from corporations not for pecuniary profit. Within the meaning of such a provision, a corporation for pecuniary profit has been defined to be a corporation organized for the pecuniary profit of its stockholders or members. Included in this class are banking, manufacturing and trading corporations, water and gas companies, and the like, which are expected to pay dividends."

Whether dividends are expected to be paid may, generally speaking, be taken as the test by which we are to determine whether, or not, a given corporation is organized for profit. Perhaps a better way to put it would be to say that a corporation is for profit when its purpose is, whether dividends are intended to be declared or not, to make a profit on the business it does which in reason belongs to it and which if its affairs are administered in good faith would be available for dividends. Subterfuges by which a corporation allowed its profits to be diverted to those owning it, though not in the form of dividends, would manifestly not remove from the corporation its feature of profit making. Nor would a mere declaration in its certificate of incorporation that it was organized not for profit, be sufficient to stamp upon it a non-profit

character. In each case, when the corporation is examined, the true facts must be ascertained and the corporation judged accordingly, no matter what its scheme of operation, or its pretensions may be. Such being true, the state is always protected against schemes to evade franchise taxes, first by the inspection which the corporation must undergo before the Secretary of State, and secondly by the writ of *quo warranto* which the state may always employ to oust a corporation for abuse of its franchise.

Profit furthermore must be something of a tangible or pecuniary nature. Intangible benefits, not capable of measurement in definite terms, though of value to the recipients, cannot be called profits. When we speak of a corporation for profit, I take it also that we mean profit coming to, or belonging to, the corporation *qua* such, as distinguished from its members or stockholders. Barring cases where profits are improperly diverted directly to the corporate members and not conveyed to them through the channel of the corporate treasury, which cases would rest on a distinct footing, the term "profit" as employed in the section under discussion means gain or earnings that are expected to come into the possession of the corporation.

This being the court's conception of the meaning of the term "profit" as it is employed in the paragraph here involved, it is now in order to examine the question of whether or not the Tidewater Coal Exchange, Inc., under the facts as disclosed, can be said to have been a corporation for profit. Reference to the brief recital of the facts set out at an earlier place in this opinion will serve in lieu of a restatement of them at this point. Those facts disclose that the Exchange handled no moneys except such as were necessary to pay the actual net cost of its operation. It bought no coal, though it could do so to the limited extent of securing sufficient tonnage to supply the debits of a member who had defaulted. But in such case the purchase would not have been on its own account, but simply as an agent acting on account of the defaulting member. I believe, however, that it never assumed to exercise even this limited power. The Exchange conducted no business for itself, engaged in no transactions that contemplated a profit for itself, never secured, or sought to secure, any gain or profits which in equity could be said to belong to it.

There is no showing of any kind which would in the slightest way indicate a design to conceal a profit-making purpose behind a corporate subterfuge. Its history shows it to have sprung from a serviceable and therefore highly meritorious wartime activity. I have no doubt that its members were benefited by its activities, and in an indirect way this benefit doubtless reflected itself in their financial betterment. The public was likewise benefited by the same services, for, to the extent that the Exchange aided in relieving congestion at tidewater, it undoubtedly benefited not alone the railroads and the coal people, but as well the public generally. What financial benefit the members may have derived from their association with the Exchange was not a financial benefit which in reality belonged to the Exchange and which, so belonging, was diverted to its members. Its costs were paid by coal shippers who were members and by railroads who were not members. I can see nothing in the evidence which indicates a purpose on the part of this corporation to make profit. It was simply an agency set up to aid in relieving a very considerable portion of industry from certain exigent difficulties which at the moment were causing great economic disturbance, with no hope or expectation of gain to itself, nor any evasive purpose to make profits and divert them to its members in some indirect way instead of in the usual form of dividends.

In view of the foregoing, the answer which the court gives to the point designated (a) is, that it was not illegal to attempt to incorporate "not for profit" such an organization as the Tidewater Coal Exchange, Inc. Having disposed of this point, the next point to be considered is that which has been above designated as:

(b) This is, that the corporation does not exist under the laws of this state, "because the alleged charter failed to state the conditions of membership in the alleged corporation." This contention is based on that clause of *Paragraph* 4 *Section* 5 of the *General Corporation Law* above quoted, which provides that where a corporation not for profit is organized without capital stock "the conditions of membership shall also be stated" in the certificate of incorporation.

The fourth and fifth paragraphs of the certificate of incorporation, quoted *supra*, contained everything that appears in the

certificate which may be said to describe the conditions of membership.

This opinion has already run to such length that I am not disposed to discuss the present point with great detail, for, if it should be that the certificate is defective in the particular suggested, such defect can have no result beyond depriving the corporation of its character of being *de jure* and giving to it the character of being *de facto*. If such be the extreme consequence of such defect, then nothing can be made of the fact in a proceeding of this nature.

"The term '*de facto* coropation' has sometimes been used as applying to any association which is, in fact, acting as a corporation; but this is clearly an improper use of the term, for individuals cannot acquire any corporate existence whatever, either *de jure* or *de facto*, by merely adopting a name importing a corporation and assuming to be and act as a corporation without color of any lawful authority. Mere user alone is not sufficient. In other cases a corporation *de facto* has been defined in effect as existing when there is (1) a charter or law under which a corporation with the powers assumed might lawfully be created, and (2) a user of the rights claimed to be conferred by such charter or law; but, while this may sometimes be true in the case of a special act creating a corporation, it is inaccurate in most jurisdictions, as applied to corporations formed under general laws, in omitting the requirement that there must at least be some attempt to organize under the charter or the law. Although there is some conflict in the decisions, as will hereafter be seen, the general rule is that there is a *de facto* corporation, so that the legality of its corporate existence cannot be attacked collaterally, where (1) there is a special act or general law under which such a corporation may lawfully exist, (2) a *bona fide* attempt to organize under the law and colorable compliance with the statutory requirements, and (3) actual user or exercise of corporate powers in pursuance of such law and attempted organization; and, on the other hand, according to the great weight of authority, that there is no corporation, either *de jure* or *de facto*, unless all of these elements exist." 14 *Corpus Juris*, § 213, *p.* 214.

To the same effect, in substance, is 1 *Thonpson on Corporations*, (2d Ed.) § 229.

In this case there was a statute under which the Exchange could be organized as a body corporate; an attempt in good faith to comply with the requirement of that statute; at the worst, an omission, unintentional so far as appears, to specify in as great detail as some might think necessary, the conditions of membership; and the exercise in good faith of corporate functions intended

to carry out the purposes of the attempted incorporation. This being so, I ought perhaps to dismiss further consideration of the objection now being considered, for if it be true that the conditions of membership were not sufficiently set out in the certificate, that one circumstance will not be allowed to render the assumed corporation a mere nullity.

But if I were required to consider the matter further, I am disposed to think that the requirement of the statue in regard to stating the conditions of membership was substantially complied with. The statute specifies "conditions" of membership. It does not specify "qualifications" of membership. Ordinarily, of course, one would think that in stating conditions of membership mention would be made of qualifications. This corporation, however, did not. It provided that its members should be the incorporators and such other persons as may hereafter become members in the manner provided by the by-laws. This language does not assume to refer to the by-laws the power of prescribing qualifications. All that the clause does is to refer to the by-laws the question of determining how members may be admitted. I think that that is entirely legitimate, and indeed quite appropriate. Conditions of membership have to do not alone with entrance into the organization, but as well with the terms on which the membership may be maintained and continued. The certificate in this case specifies that these conditions are that the members shall observe all the requirements of the by-laws or the rules and regulations made in pursuance thereto on the penalty of forfeiture, not only of membership, but as well of rights and interest in the corporation and its property. Furthermore, there is the condition that all members shall stand on an equal footing with respect to voting power and property right, and no member may assign or transfer his membership. While the conditions of membership might have been more fully set out by stating, for instance, that members should be persons of full age who might be elected by the directors, yet I think there has been sufficient compliance with the requirements of the act to justify the view that they are substantially met. But, even if this should be erroneous, the corporate existence of this corporation cannot be successfully questioned in this proceeding, because of an omission to set out in

more detail the conditions of membership therein, for the reason as above stated, that it undoubtedly has at the least a *de facto* existence.

Because of the views I have hereinbefore expressed, it is unnecessay for me to notice the other questions discussed at the argument involved in the doctrine of estoppel as available to protect the corporation from attack by a creditor in the pending proceedings.

The views I entertain with respect to the main question make it likewise unnecessary for me to consider the fourth point of law noted at the outset.

The rule to show cause will be discharged.