The defendant was incorporated on April 19, 1926. Its purposes were stated in its original certificate to be as follows:
"The purposes for which the corporation is formed are, a membership or non-stock corporation, to maintain, conduct and provide for its members reading and club rooms; to provide, give and promote social intercourse among its members; and for the general advancement of its members through any honest and honorable methods that may later develop."
By an amendment to its certificate adopted July 19, 1927, the corporate purposes were stated as follows:
"(1) To unite fraternally and for mutual benefit, protection, improvement and association loyal American citizens of sound body and health not less than twenty-one nor more than forty-five years of age, of good moral character and of reasonable desire and ambition to improve themselves and willingness to help others.
"(2) To foster and cultivate the social, educational, and business relations of the members; to broaden their interests in the pursuit of their occupations and professions; and to improve their standards of efficiency and productivity.
"(3) To encourage among the members closer personal acquaintance and a friendly spirit of mutual co-operation.
"(4) To gather, receive and disseminate such information as may seem helpful to the members; to interchange ideas in rendering mutual assistance and to provide helpful vocational advice and guidance.
"(5) To forward and promote the general welfare and prosperity of the members and to improve by any and all lawful and honorable means their status and condition. *Page 787 
"(6) To encourage the promotion and establishment of subsidiary local Decimo Clubs to improve, maintain and conduct club and recreational facilities and reading rooms for the members and their friends.
"(7) To purchase, lease, hold, sell, develop, mortgage, convey or otherwise acquire or dispose of real and personal property necessary or proper for the carrying out of the purposes of this corporation in such states and communities outside the state of Delaware as the National Board of Governors may in their discretion deem wise; and to erect, equip and maintain social club houses and other appropriate buildings for the use and enjoyment of all the members of the club upon and under such terms and conditions and subject to such rules, regulations and restrictions as the National Board of Governors may from time to time determine.
"(8) To invest and reinvest surplus funds in such securities or properties as the National Board of Governors may from time to time determine.
"(9) To publish and circulate publications of any kind and description.
"(10) To assist in any other matters pertaining to the welfare and advancement of the members and for the attainment of the highest order of American citizenship."
The bill charges that the organization of the defendant as a corporation not for profit was a mere pretense, and that its claim to be a corporation for fraternal and social purposes is a mere sham, that the real purpose of the corporation at its inception was the personal pecuniary benefit and advantage of its organizer, Monjar, and of its officers. It is further charged that Monjar, upon organization of the corporation, caused it while under his control to enter into or assume a contract with himself under which Monjar should receive as compensation for his services in securing members the entire initiation fee of $20; this arrangement being later modified so that the club received a portion of the initiation fee and Monjar the balance.
The membership of the club grew to above 60,000 located in several states of the Union, and its chapters numbered 37.
The bill alleges that Monjar caused another corporation to be organized called the Apasco Purchase Sales Corporation, all of the stock of which was issued to Monjar. The purpose of this corporation was, in consideration of a monthly charge of $3 to supply to the members of Decimo Club, Inc., the privilege of purchasing upon favorable discount terms various articles of merchandise which it either carried in stock in its own warehouses, or which, by contract arrangement with wholesalers, etc., could be obtained upon requisition from the Apasco Corporation. The Apasco Corporation owned or controlled another concern called the Drew Tailoring Corporation, through which it was enabled to extend to subscribers for its service the privilege of purchasing men's tailored clothing upon favorable terms.
The so-called Apasco service was not available for every chapter of the club. It was dependent upon whether the size of the membership of a given chapter was sufficiently large to warrant the opening of an Apasco branch. In those chapters where the service was rendered, the club collected $5 monthly from each member, which was divided as follows: Three dollars to the Apasco Corporation and $2 to the club. It appears that whenever members joined the club, they also signed a subscription obligation for the Apasco service upon which payments started, however, only when the service was established for the local chapter.
Monjar received several hundred thousand dollars from initiation fees and his Apasco Corporation accumulated from the monthly payments referred to assets in the neighbor-hood of $495,000.
When the club held its national convention in October, 1927, the Monjar régime was overthrown and a new board of governors was installed. Demand was made upon Monjar for payment by him to the club for the benefit of its menbers, of the sum which he had received in the manner above described. It was contended by the new board that Monjar's gain had been made with money belonging to the club members and that he should be held to account therefor. In response to this demand, Monjar admitted liability in a large sum and in settlement thereof turned over to the club all the stock of the Apasco Corporation. The club thereupon took steps to liquidate the business of the Apasco Corporation, the purpose being to discontinue the Apasco service altogether.
The club, by reason of Monjar's activities, had been subjected to investigations in at least two of the states, and the legality of its operations had been the subject of considerable discussion as well as a source of annoying publicity.
Accordingly, the new board addressed itself to the problem of devising a new plan of operation which it was thought would be free from the supposedly objectionable features of the old Monjar plan, but would in a proper and lawful manner save to the corporation the benefits of the salient feature of the Monjar idea, viz. the joining in a common activity of an appeal to the social and fraternal instincts of men together with an appeal to the individual desire for profit and gain.
With this thought in mind a new plan was formulated and approved. This plan is as follows: A trust was set up under the laws of New Jersey, called the Decimo Trust of America. The declaration of trust elaborately sets forth the trust's terms. In brief they are as follows: Trustees are created with power of succession. The regular term of office of a trustee is three years and elections to vacancies are made by the incumbent *Page 788 
trustees from the nominees of trust certificate holders in each regional district of the club. Trustees must be members of the Decimo Club, Inc., in good standing. The trust is to continue for 50 years, or until earlier terminated by a majority of the holders of the beneficial certificates issued by the trust to its members. No one is eligible to hold beneficial membership in the trust unless he be a member of Decimo Club, Inc., the defendant in this cause; and the club's constitution and by-laws provide that an applicant for membership in the club must, when he makes application for membership, at the same time subscribe to the terms of the Decimo Trust of America, depositing with the secretary of the local chapter of Decimo Club as an escrow agent the sum of $25, or such other sum as the trustees shall from time to time determine, which sum, when the application is accepted, must be remitted to the Decimo Trust, and upon rejection of the applicant must be returned to him. Upon acceptance of a membership, the trust issues a certificate of beneficial membership which entitles the holder to an equal pro rata beneficial interest in the trust estate and to an equal pro rata share in all dividends declared by the trustees. The initial payments of $25 received by the trust upon the acceptance of memberships are put into a revolving fund provided for by the terms of the trust, the purpose of which fund is. principally to provide for the redemption of certificates from time to time. Under the plan, no dues are collected by the club from its members. As subscribers to the trust, however, members of the club must pay $5 a month to Decimo Trust of America. The obligation of the trustees is to apply the five dollar monthly payments as follows:
"22. From each monthly payment of five dollars ($5.00) received from Certificate Holders the Trustees shall invest, appropriate and/or use the sum of three dollars ($3.00) for the purchase of shares of the class B common stock of Decimo Industries, which shares shall be held permanently by the trustees as part of the trust estate.
"23. The trustees shall appropriate for the current expense and endowment of the fraternal and welfare activities of the Decimo Club the sum of two dollars ($2.00) from each five dollars ($5.00) monthly payment received from the certificate holders. The trustees shall make such adjustment in the expense of maintaining the Decimo Club, chargeable to such appropriation of two dollars ($2.00) as they may deem advisable from time to time. In the event that the total expense of maintaining the activities of the Decimo Club becomes less than the total amount hereby appropriated for such purposes, the trustees shall establish a special fund (here-inafter called the `endowment fund') to which shall be appropriated all moneys received by them under this section and not so expended in maintaining the Decimo Club, for the endowment of the fraternal and welfare activities of the Decimo Club. The endowment fund shall be invested or reinvested in securities to be selected and approved by the trustees in accordance with the terms hereof relating to such investments. The trustees are empowered hereby to deduct from the said appropriation of two dollars ($2.00) the reasonable expenses of operating and maintaining these trusts. No such deduction, however, shall be made from the said two-dollar ($2.00) appropriation except in the event that the income from the revolving fund hereinafter referred to shall be inadequate for the administration of these trusts and, in such event, only that amount necessary to supplement such revolving fund income to the extent required shall be so deducted."
Decimo Industries, referred to in paragraph 22, just quoted, is a corporation of this state. It constitutes the third piece of mechanism in the Decimo plan. It is a corporation designed for profit, and is projected as a concern which will employ the funds received from sale of its stock to the Decimo Trust of America in a variety of money-making ways. Dividends from its stock will go to the Decimo Trust of America, and by the latter will be passed on from time to time to its certificate holders (members of the Decimo Club) in the form of dividends. Paragraph 56 of the declaration of trust deals with the subject of the disposition of the trust estate upon dissolution of the trust. It is as follows:
"56. Upon the termination of this trust by the said limitation or under the provision herein contained, the whole trust estate of whatsoever nature, whether real, personal or mixed, and wheresoever situated, shall thereupon become and shall be the property of the Decimo Club, a membership corporation, organized and existing under and by virtue of the laws of the state of Delaware."
The foregoing constitutes a bird's-eye view of the Decimo plan as now operating. There are a great number of provisions set out in the club's constitution and by-laws and in the declaration of trust of the Decimo Trust of America, not referred to in the above description and which are omitted because not necessary for the present purposes to be stated.
The foregoing facts are gathered in part from the pleadings and in part from the evidence. Upon the facts, there is no dispute except upon the question of whether the new plan, with its triad of Decimo Club, Inc., Decimo Trust of America and Decimo Industries is in fact in operation. The ensuing opinion makes a finding on that question. Except for that one question of fact, the issue between the parties is one of law, namely, do the facts show a misuse and abuse under the law of its charter by the defendant corporation ?
 Heard on bill, answer, testimony of witnesses and exhibits. *Page 789 
[1] Upon the question of whether or not the so-called plan is effective and in operation, there is a dispute. The circumstance to which the defendant's witnesses point as showing that the plan is not in operation is this, namely, that certain assets have not been transferred by the club to the trust as contemplated by the plan, and therefore the latter is not yet effective. To this it is to be said that the transfer of the assets referred to does not appear to be made a sine qua non of the plan's operation. That the trust, notwithstanding the absence of the transfer, is an active and going organization is clear from the evidence. Members joining the club must at the same time subscribe to the terms of the trust, paying the initial sum of $25, or other amount as may be required by the trustees for the uses of the trust; the $5 monthly payment as provided by the club and trust regulations is being collected by the trust from each member of the club; the allocation of monthly payments is being made in accordance with the terms of the declaration of trust; the chapters of the club are being supported by appropriations from the accumulations of the $2 monthly amounts allotted for that purpose and certificates of beneficial membership in the trust have been issued and are being issued as new members of the club join.
It is clear from the evidence that the trust is functioning as a part of the Decimo plan, notwithstanding it may not be in possession of as much in the way of assets as was originally anticipated as possible. The withheld assets are those which were to be conveyed by the club and the only reason why the transfer has not been made is that one of the club's officers has become recalcitrant and refuses, in the face of demands and threats of expulsion by fellow members of the board of governors, to make the transfer. The trust, in spite of this dissension among the club's officials, has however proceeded with its contemplated activities. Decimo Industries, a corporation, has been incorporated and I assume that the Decimo Trust has employed, or will employ, $3 of the $5 received monthly from each of its subscribers (also club members) to the purchase of that corporation's stock as it is obligated to do.
The plan seems, therefore, to be in operation and I am compelled to the view that the Decimo movement with its three features (club, trust and industries) is in full swing, so to speak.
The bill charges that the club was, under the Monjar régime, engaged in business for profit through the Apasco Corporation and the Drew Tailoring Corporation; that when its business activities as conducted by Monjar needed to be discontinued by reason of troubles which the club encountered as incident thereto, the managers of the club engaged in an effort to revive and continue the business theretofore conducted through the Apaseo Corporation and the Drew Tailoring Corporation through other corporations which the managers of the club might cause to be organized. The bill does not attempt to specify the method by which the defendant proposed to continue in the business referred to. But the evidence, it is contended, shows that method to be the scheme or plan referred to in the statement of facts, Decimo Industries being the profit earner of the group. I do not deem it necessary to pass upon the question of whether or not the club under Monjar's régime, did in fact operate as a profit-making concern. This, however, may be said, namely, that the evidence adduced except in one particular leaves it doubtful whether the club under the Monjar management did in fact operate as a profit-making concern. The particular referred to consists of an admission made in a letter dated December 27, 1927, and written by the national board of governors of the club per T. M. Phillips, its executive committeeman, to the New York District, No. 1. The language of the letter constituting such admission is as follows:
"We are confronted with a great taxation problem which is, in itself, extremely difficult. As a membership corporation we have been advised that we have no legal right to engage in business undertakings. Yet, under the leadership of Mr. Monjar your club did indirectly engage in business through the Apasco Corporation and the Drew Tailoring Corporation from the former of which enterprise, however, Mr. Monjar and his associates derived the greatest amount of benefit."
[2, 3] It is to be noted that the language of this letter admits in behalf of the national board of governors that the Club had indirectly engaged in business. If its business activities were such as to warrant the view that the corporation was in fact one for profit, the circumstance that its activities were carried on indirectly rather than directly cannot help the situation, for indirection finds no more favor in equity than does direction. All that the letter admits is the indirect engaging in business. The extent to which business was engaged in is not set forth. Whether it was such as to indicate profits to be one at least of the principal objects of the corporation's existence cannot be inferred from the admission. I take it that a non-profit or membership corporation may be permitted to engage in business to some extent and that the statute does not mean to prohibit absolutely and entirely such corporations from doing business. The statute does not mention the word "business." *Page 790 
It speaks only of corporations "not for profit." While profit has its origin ordinarily from business activities, yet it does not follow that a membership corporation which engages in business is necessarily a corporation for profit within the meaning of the act. If the facts and circumstances show the business to be such in character and volume as to indicate that the engaging in business and the making of profits therefrom for the benefit of its members is the principal or one of the principal objects of the corporation, rather than a thing which is subordinate and merely incidental to the principal object of its existence, it is reasonable to conclude that the corporation cannot be called one which is organized "not for profit."
In Read v. Tidewater Coal Exchange, Inc., 13 Del. Ch. 195, 116 A. 898, the following language was used in reference to the sort of corporations meant to be covered by the phrase "not for profit" as used in the statute we are here concerned with:
"Whether dividends are expected to be paid may, generally speaking, be taken as the test by which we are to determine whether, or not, a given corporation is organized for profit. Perhaps a better way to put it would be to say that a corporation is for profit when its purpose is, whether dividends are intended to be declared or not, to make a profit on the business it does which in reason belongs to it and which if its affairs are administered in good faith would be available for dividends. Subterfuges by which a corporation allowed its profits to be diverted to those owning it, though not in the form of dividends, would manifestly not remove from the corporation its feature of profit making. Nor would a mere declaration in its certificate of incorporation that it was organized not for profit, be sufficient to stamp upon it a non-profit character. In each case, when the corporation is examined, the true facts must be ascertained and the corporation judged accordingly, no matter what its scheme of operation, or its pretensions may be. Such being true, the state is always protected against schemes to evade franchise taxes, first by the inspection which the corporation must undergo before the Secretary of State, and secondly by the writ of quo warranto which the state may always employ to oust a corporation for abuse of its franchise.
"Profit furthermore must be something of a tangible or pecuniary nature. Intangible benefits, not capable of measurement in definite terms, though of value to the recipients, cannot be called profits. When we speak of a corporation for profit, I take it also that we mean profit coming to, or belonging to, the corporation qua such, as distinguished from its members or stockholders. Barring cases where profits are improperly diverted directly to the corporate members and not conveyed to them through the channel of the corporate treasury, which cases would rest on a distinct footing, the term `profit' as employed in the section under discussion means gain or earnings that are expected to come into the possession of the corporation."
The admission referred to in the letter above quoted is not enough to indicate that the corporation under the Monjar management had done acts which would bring it within either the letter or the spirit of the language used in the Tidewater Coal Exchange Case. Nor can I find anything in the other evidence in the case which persuades me that the Monjar management had turned the corporation into a profit-making concern. Whether the whole story of the Monjar régime is told by the evidence, I do not of course know. Looking only at the evidence, however, to which the court is of course confined, what Monjar seems to have done was to use his position as the dominant factor in the club for the purpose of making money for himself. When the Monjar control was ousted and the present régime installed in power, the new national board of governors evidently took the view that Monjar's gain had been obtained from moneys belonging to the club members and accordingly made demand upon him to make restitution to the club itself. In so far as Monjar's gains came from the contract with the club by which he took all or part of the club's initiation fees, the demand upon him was entirely consistent with the club's status as a non-profit organization. But in so far as the demand was predicated upon profits which Monjar earned through the business activities of the Apasco and Drew companies, it would seem that the club by making the demand recognized Monjar's business ventures as its own and there-by confessed itself as the true owner in behalf of all its members of Monjar's purely profit-earning enterprises. This may explain the admission made in the letter before quoted, and if true would seem to impress upon the club the character of a concern one of whose principal objects was the earning of profits.
[4] As a result of the demand upon Monjar for restitution, the club came into ownership of all the stock of the Apasco Corporation which in turn controlled the Drew Tailoring Corporation. It proceeded to liquidate the affairs of these concerns with the view of discontinuing the service which they had under the Monjar régime rendered to the club members. The process of liquidation is still going on. Something has been attempted by the state to be made out of the activities of the club in connection with this liquidation. If the acquisition of Monjar's Apasco stock was unobjectionable, I do not see how the mere liquidation of the assets represented by the stock can be regarded as objectionable, and accordingly nothing is to be predicated on the mere liquidation activities.
A moment ago, it was observed that the evidence, outside of the admission contained in the letter referred to, leaves it doubtful whether the club under Monjar's management did in fact operate as a corporation for profit. The manner of conducting the club and shaping its policy since the termination of that régime is significant as possibly tending by its *Page 791 
Coloring effect to render less doubtful the character of the Monjar policies; certainly it is of the utmost significance in determining the business policy of the club at the present time and since the present management was installed in power.
Accordingly it is now in order to examine the club and its activities as the same have been and are being managed under the present national board of governors. One thing would seem to me to stand out clearly and that is that whether or not the Monjar plan of operation constituted in fact a doing of business by the club for profit, the new board of governors saw the money-making possibilities which lay in the fundamental idea at the root of Monjar's operation. They saw, in other words, the fruitful possibilities to be realized by a joint appeal to the fraternal and social instincts of men on the one hand and to their desire for gain on the other. Monjar had demonstrated the ease with which business could be done with a group of men behind him who were welded together in the name of fraternity and brotherhood and who as a group could be exploited with the offer of opportunities of either making or saving money. Men organized on the basis of an appeal to the instincts of brotherhood were shown to be capable of a cohesive welding by the opportunity for business gain.
That the new national board of governors saw this and addressed themselves to the problem of retaining the essence of Monjar's idea while abandoning its supposedly objectionable illegality, is a fact which stands out clearly from the evidence. And so they devised and placed in operation the present plan known as the Decimo plan or movement. By this plan, it was evidently thought that the fraternal and social phases of the Decimo movement were kept completely segregated from its profit-making phases. The former are thought to be provided for by the Decimo Club, Inc., the defendant in this cause, a non-profit organization; the latter by the Decimo Industries, a profit-making corporation. The Decimo Trust is the link which connects the two. No one can be a member of the club unless he subscribes to and becomes a certificate holder in the trust. No dues or initiation fees are paid to the club by its members. All payments of initiation fees and monthly sums go to the trust, and the club chapters are dependent upon the discretionary bounty of the trust for moneys necessary for their proper functioning. The trustees must be club members and are chosen from nominees named by the certificate holders (club members). The $5 monthly payments made by each member go to the trust and are allocated — $2 for club purposes and $3 for investment in stock of Decimo Industries. It is in connection with the use made of the aggregate of the monthly sums of $3 that the state insists the element of profit-making is made out against the defendant. If the club reaches its projected maximum membership of 100,000, these monthly payments will yield $3,600,000 per annum available for investment in Decimo Industries, a corporation designed for a variety of investment and industrial purposes. During the life of the trust (which must terminate in not longer than 50 years, or may be ended at any time by vote of a majority of its certificate holders who are all club members), the dividends from the trust's investments in Decimo Industries' stock are, when distributed by the trustees, to go to the certificate holders. If this were the end of the story, it is very doubtful if anything of an illegal nature could be charged against the club as a non-profit organization, because so far as yet appears the club as such derives no benefit from the business which its members in another r Ô le as certificate holders hope to profit from.
But this is not the end of the story. A most important and significant provision (section 56) in the declaration of trust is this, that upon the termination of the trust, its property and assets belong, not to its certificate holders, but to the club, this defendant. How this provision can indicate anything other than that the club is in reality the owner of the investments made by the trust, it is impossible to see. If the trust, while it is functioning, should choose not to declare dividends to its certificate holders, but to allow all its earnings from the Decimo Industries investment to accumulate, it is manifest that in the end the club itself as an entity distinct from its members would upon termination of the trust own not only the principal of the investment made by the trustees, but as well all profits obtained therefrom. In that event the club would disburse, or would have available for disbursement, the earnings to its, or for the benefit of its, members qua such. If no such cumulation of profits by the trust were allowed, the same would be disbursed to the same class, viz. club members, not to be sure qua such, but as certificate holders. The situation therefore is one where money is being collected from club members to be invested for profit-making purposes, the investment constitutes as to its corpus a trust estate for the club and the earnings from the corpus go either to the club members direct, who temporarily are called certificate holders, or eventually to the club. Looking through the technical aspects of the scheme, it appears in substance to be the same as though the club itself took three dollars a month from each of its members for the purpose of embarking upon profit-making enterprises, passed on to or for the benefit of its members such portions of the profits earned as its governing officials might from time to time determine and eventually holding or distributing the corpus of the investment *Page 792 
together with all investments and accumulated earnings as future policy might suggest.
To be sure a corporation in legal contemplation possesses a distinct entity of its own. Yet in a very substantial sense it may be thought of as a creature made up of its membership. It exists for them and holds all its franchises, property and assets in trust for them. Its capital is theirs and its profits are theirs to be passed on to them for individual use or held and employed for their benefit. The designers of the plan here under review have succeeded in holding intact for the defendant corporation all the moneys or their equivalent collected from the club membership for the ultimate ownership of the club and, for an interval of time, indirectly assuring to the membership the profits earned, after which interval the membership shall look directly to the club entity for their direct or indirect participation in the investment and the profits. The defendant seeks to obviate the effect of section 56 of the declaration of trust as pointing to the club as the true owner of the business by arguing that the title to the assets which must ultimately vest in the club is a title not in its own right, but one simply in trust for the certificate holders. This argument is without force for two reasons. In the first and most important place, it finds no support in the language of the section itself by which the devolution of title is provided for. In the second place, any trust that might be inferred can be nothing more than the usual quasi trust by which corporations of every kind hold the corporate assets, that is for the benefit of its membership. In this case the club membership is synonymous with the body of certificate holders, and in reality therefore there can be no trust aspect in the situation which divorces the corporation itself from that absolute ownership by which all corporate creatures hold their assets.
The whole scheme appears to be a subterfuge by which the defendant, incorporated as a no-profit concern, seeks to accomplish as one of its chief purposes the end of earning pecuniary profits for its members, keeping control all the time over the operations of the venture and ultimately emerging in plain view as the absolute owner of the profit-seeking enterprise. So far as I am advised clubs of a social and like nature do not make provision for the saving to retiring members or to the estates of deceased members of an equitable portion of the corporate assets in hand when the connection is terminated. This emphasizes the purely non-profit character of such organizations. In the instant case however the purely business aspect of this club's character is recognized by the detailed provision touching the redemption value of each member's equity in the assets of the trust (ultimately of the club), for upon the cessation of club membership, rights in the trust estate are terminated and the cash value of the member's beneficial interest in the trust estate is paid to him. Furthermore, no new member can come in until he has paid an initial sum equivalent to the then cash value of a member's equitable share in the assets. These provisions are thoroughly consistent with the conception that the club, whatever else it may be interested in, regards itself as handling a business enterprise in which the rights of its respective members in the assets and profits of the venture ought in all fairness to be brought to an even equitable basis.
The purposes of the club as set forth in its certificate are such as to show it to be a corporation not for profit. The evidence shows, too, that it engages in certain activities of a non-profit nature, such as work of a social, welfare and general cultural nature. But the facts show also that in practice, one of its chief purposes is to engage in business for profit to its members, said business being segregated in a trust for a limited period and at the end of the period to be turned over to itself as the legal owner. This money-making purpose is not a merely incidental and collateral one. If it were, a different case would call for consideration. The purpose to make profits directly or indirectly for its members appears to be not the only important purpose, but certainly an important purpose; so much so that it is difficult to say which outranks the other — the purpose to advance the social and cultural welfare of its members, or the purpose to make money for them. From the evidence, it would seem that from its organization to date the appeal has been more to the instinct of men for profit than to the instincts for social and fraternal development.
It is doubtless true that a social organization may be incorporated under the non-profit provision of our statute and within reasonable and proper limits engage in an activity to make profit. How far such an organization can go in that direction it is impossible to say in general terms. Each case, as observed in Read v. Tidewater Coal Exchange, Inc., supra, must stand on its own facts. Where, however, a non-profit corporation shows by its conduct that profit-making is one of its most important purposes, if not its chief one, I can see no escape from the conclusion that it has misused and abused its franchise. If its sponsors desire to resort to the act of this state for its incorporation, resort may be had to the provisions appropriate for that form of organization.
It was not the intention of the Legislature to allow the easy and liberal provisions of the corporation and revenue statutes applicable to corporations organized not for profit to be enjoyed by corporations whose purpose is in fact to engage in business for profit to such an extent that the desire for profits constitutes a conspicuous object of its existence.
[5, 6] Solicitors for the defendant make the *Page 793 
point that courts are reluctant to pronounce a sentence of death upon a corporation for abuse of franchise. In this connection they cite: People v. North River Sugar Refining Co., 121 N. Y. 582, 24 N. E. 834,9 L.R.A. 39, 18 Am. St. Rep. 843; State ex rel. Clapp v. Minnesota Thresher Mfg. Co., 40 Minn. 213, 41 N. W. 1020, 3 L.R.A. 518; Thompson on Corporations, §§ 6478, 6479; 7 Ruling Case Law, § 715, p. 710; and 14 C. J. 1107. Where, however, there is a clear case of abuse of corporate privileges and franchises as in People ex rel. v. Michigan Sanitarium Benevolent Ass'n, 151 Mich. 452, 115 N. W. 423, courts will not hesitate to pass the sentence. I cannot escape the conclusion that the evidence in this case shows the defendant, organized as a non-profit corporation, to be now engaged in misusing and abusing its corporate powers, privileges and franchises by seeking as one of the principal objects of its existence to make profits for the use of itself and members. Such being the conclusion a decree of revocation and forfeiture as authorized by the statute must be entered.
Decree accordingly.
 *Page 197