Harry E. FLEISCHHAUER, et al.,
Plaintiffs–Appellees,

v.

C. Elvin FELTNER, Jr., et al.,
Defendants–Appellants.

No. 87–4060.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 10, 1989.

Decided June 27, 1989.

Supplemental Opinion of Aug. 31, 1989.

Douglas G. Cole, Richard Boydston (argued), Strauss & Troy, Cincinnati, Ohio, Martin C. Weisman, Anthony V. Trogan, Weisman, Trogan, Young & Schloss, Birmingham, Mich., for defendants-appellants.

Roger C. Stridsberg (argued), James Rimedio, F. Harrison Green, Cincinnati, Ohio, for plaintiffs-appellees.

Before KRUPANSKY and WELLFORD, Circuit Judges, and JOINER,* Senior District Judge.

WELLFORD, Circuit Judge.

This appeal follows a jury verdict awarding appellees treble damages of $3,951,-351.00 for RICO violations associated with appellees' participation in appellants' film investment program. Appellants raise several issues regarding liability and damages. We affirm the liability determination, except as to Krypton, and reverse, in part, the damages award.

## I. FACTS

This controversy arose when 19 separate plaintiffs purchased non-theatrical rights to the distribution of 23 full length feature motion pictures and television episodes from five defendants.[1]

The rights in the films the plaintiffs purchased included the right to distribute the films on television and cable television, by video cassette, and for other viewing except in movie theaters. Most plaintiffs entered into contracts with either Metropolitan or Palm Beach in November or December of 1980, but Donald Forrester entered into a contract with Metropolitan in early 1981.

---

* The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The defendants are: C. Elvin Feltner, Jr., Robert J. Levine, Palm Beach Properties, Inc., a/k/a Palm Beach Films, Inc. (Palm Beach), Metropolitan Properties, Inc., a/k/a Metropolitan Films, Inc. (Metropolitan), and Krypton Corporation (Krypton).

The five defendants all allegedly participated in the marketing and sale of the film rights to the plaintiffs. Metropolitan and Palm Beach sold to the plaintiffs the distribution rights to the films. Krypton was not incorporated until September 28, 1982, but it is alleged, nonetheless, that Krypton was actively engaged in the film marketing plan as early as November of 1980. Feltner was the sole shareholder, a director and the chairman of the three defendant corporations. Mr. Levine, an attorney, was an officer of each defendant corporation.

In October, 1980, Levine mailed a packet of information to Fleischhauer, an investment advisor, on the availability of the films in question. Levine followed up the mailing by telephoning Fleischhauer. As a result of that conversation, Levine mailed Fleischhauer a "full kit" detailing the terms of the film program offered. Fleischhauer contacted Donald Forrester, his accountant and a certified professional accountant, to review the full kit. Levine then traveled to Cincinnati in November to discuss the investment with Fleischhauer and Donald Forrester and afterward Fleischhauer checked references Levine furnished.

In the agreement reached at the meeting, Fleischhauer was to receive a 10% commission on each sale Metropolitan made and a 20% commission on each sale Palm Beach made. Fleischhauer agreed to share the commissions with Donald Forrester. Fleischhauer received $56,000 in commissions on sales of the film rights to the plaintiffs. At oral argument, appellees noted that no evidence was admitted indicating that Fleischhauer paid any commissions to Donald Forrester. All other plaintiffs were initially advised of the investment opportunity by Fleischhauer or by Donald Forrester.

Most plaintiffs received their information either directly or indirectly (through Fleischhauer or Forrester) from the full investment kit, in which a written explanation of the prospective investment was set forth. This kit is over 100 pages long and contains material relating to the tax benefits of the transaction, a list of film titles

available, a purchase and sale agreement, copies of financing options, a 64 page legal opinion and miscellaneous questions, answers and examples.

The transaction was described by the seller defendants as a purchase for both income and tax advantage purposes to be financed through an initial "down payment," the balance expected to be paid with interest from revenues generated by the buyers' distribution activity over a ten year period. The purchase prices and down payments varied depending upon the nature of the film.[2] The standard form contract included a provision for making the down payment in installments. Buyer plaintiffs were to take full responsibility for arranging the distribution of the film. Sellers represented that plaintiffs could enter into further distribution contracts providing that the distributor would retain 40% of the gross revenues without any reimbursement of expenses.

The kit issued by defendants explained that a plaintiff could obtain a refinancing agreement with an unaffiliated entity, Southwest Capital Corporation, in the event revenues were not sufficient to pay the purchase price over the ten year period. It also addressed the tax implications of the purchase and discussed *KIRO, Inc. v. Commissioner*, 51 T.C. 155 (1968). (Under that decision, the owner of film distribution rights was permitted under certain circumstances to deduct 100% of the purchase price of the films over 7 years at a rate of 60% in the first year, 15% in the second year, and 5% for each of the following five years.)

Through the kit materials furnished, defendants also advised interested parties that there was a significant chance that the purchaser would be audited by the Internal Revenue Service because of earlier abuses regarding production and distribution of motion pictures. Defendants offered to convert liability on the purchase contract from full recourse to nonrecourse in the event the IRS disallowed anticipated deductions and write-offs on the investment. A condition of that conversion option was

---

**2.** The required down payment was, generally, approximately five percent higher in a sale by

Palm Beach than one offered by Metropolitan.

that the purchaser plaintiff must contest the IRS determination.

A list of numerous distributors was provided to Fleischhauer, but it was expected that those films which were episodes in a series would be handled by a single distributor. In the event all episodes in a series were not sold, the seller agreed to make the unsold episodes available to the purchaser's distributor.

A number of the plaintiffs testified that they never spoke with either Feltner or Levine prior to purchasing their film and that they relied solely on the advice of Fleischhauer. Plaintiff Ralph testified that he spoke to neither Feltner nor Levine before purchasing his film but relied solely on the advice of Fleischhauer and Donald Forrester and his own review of the kit. Several plaintiffs testified that they spoke with Levine before signing his contract on limited subjects such as selection of film or the distribution process. Only four plaintiffs, including the Forresters and Fleischhauer, spoke with Feltner before purchasing their film rights.

There was no evidence about the identity of the particular seller in the case of four other plaintiffs.[3] Six plaintiffs purchased their films from Metropolitan; the remaining plaintiffs purchased their films from Palm Beach.

All plaintiffs allegedly entered initially into distribution contracts with Joseph Green Film Enterprises, Inc. (Green) which was not named as a defendant. Access letters were provided to Green for the benefit of all plaintiffs in order that Green could obtain access to the films, but Green failed to secure distribution of any of the films because many unauthorized copies of the films were available to those who wished to use them and the copies plaintiffs purchased were of poor quality. Testimony was offered that Levine knew, before the films were sold, that the films were not marketable either because they were unauthorized copies or because unauthorized copies were readily available.

Because they were unsuccessful in efforts to distribute or lease the films, several plaintiffs who had made only partial down payments withheld the balances within a few months after execution of their contracts. Others testified that although they obtained options with Southwest Capital Corporation to extend the ten year period in which the contract balance was to be paid, they subsequently failed to pay the required annual fee to preserve that option.

As a result of their failure and resulting frustration in effecting distribution of their films, plaintiffs were solicited by Bruce Forrester and Donald Forrester to pursue this litigation against defendants seeking compensatory and punitive damages and attorney's fees, based on RICO charges and Ohio common law fraud.

Appellants have submitted a chart, which is attached as an appendix, compiled from trial testimony and exhibits, setting out pertinent data concerning each plaintiff, the purchase price involved, the actual payment made to defendant or defendants, whether that plaintiff who claimed tax write-offs was audited, a purported outline of tax treatment, and damage awards rendered (before any trebling of the award under RICO). Appellees have not challenged appellants' computations. In all, fourteen of the nineteen investors were audited by the Internal Revenue Service, which disallowed very substantial deductions claimed. The bulk of damages awarded to plaintiffs was against defendant Feltner. Donald Forrester, as an extreme example, paid nothing on his investment of $162,500, yet claimed $97,500 worth of tax benefits which have been challenged by IRS. Donald Forrester was awarded, nonetheless, almost $171,500 in damages subject to trebling. Fleischhauer invested some $138,500, paid only $200 and claimed $40,000 in tax benefits, which was challenged by IRS. He was awarded $56,754 in damages (apart from commissions and trebling). Total damages awarded all plaintiffs, before trebling, against the defendants was $1,317,117.00.

Of the nineteen investments made, fourteen of the nineteen investors were audited

---

**3.** There were also six plaintiffs as to which there was no contract identified, offered, or admitted into evidence.

by the Internal Revenue Service for deductions taken relating to their film purchase.

The first RICO claim by each plaintiff alleges, in part, as follows:

Defendants "... John Does and Jane Does, enterprises engaged in and whose activities affect interstate commerce, did conduct and participate in their affairs through a 'pattern of racketeering activity,' as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), and in so doing, violated 18 U.S.C. § 1962" thereby entering plaintiffs and their business [and, further, that].

"... defendants, acting as a group and constituting an enterprise as that term is defined in 18 U.S.C. § 1961(4)" devised a scheme to defraud each plaintiff "in a manner prohibited by 18 U.S.C. §§ 1341 and 1343 and thereby violated 18 U.S.C. § 1962."

The second RICO claim by each plaintiff alleges, in part, that:

"for purpose of executing the aforesaid scheme" Messrs. Feltner and Levine "utilized, or caused to be utilized, the United States Mail facilities in interstate commerce on two or more occasions and thereby violated 18 U.S.C. §§ 1341, 1343, and 1962" [and further, that]

Messrs. Feltner and Levine "did conduct and participate in the affairs of" defendants, "enterprises engaged in and whose activities affect interstate commerce, through 'pattern of racketeering activity,' as that term is defined in 18 U.S.C. § 1961(1) and § 1961(5), through a scheme, artifice, and device to defraud" and, in so doing, "injured plaintiffs in their business and property."

Defendants requested the district court to instruct the jury that the burden of proof for plaintiffs on their RICO claims as in the case of their state law fraud claims, was by clear and convincing evidence. The district court instead adopted a preponderance of the evidence standard. Defendants also moved for a directed verdict, both at the conclusion of plaintiffs' case and of defendants' case. A primary basis for the motion, on the part of Krypton, was that it had not been formed as a corporate entity until well after the sales to plaintiffs.

In closing argument to the jury, plaintiffs contended that the damages they sustained were the actual total purchase price of the films acquired, plus the down payments actually paid, plus the penalty and interest they incurred in tax charges and "everything they had to go through and are still going through" as a result of the alleged wrongdoing by defendants.

Submitted to the jury with the instructions were ten separate interrogatories, five on the RICO claims, five on the common law fraud claims, and two separate damages charts, one for the RICO claims and the other for common law fraud claims.

The jury answered these interrogatories by indicating that all defendants had violated the RICO statute and had committed both mail fraud and wire fraud (except that there was no wire fraud on the part of Krypton), and that all plaintiffs had been affected by either such mail or wire fraud. The jury at the same time did not find any defendant had committed fraud under Ohio law.

The district court then entered an order trebling the damages in favor of each plaintiff against each defendant to produce a total money judgment in the amount of $3,951,351. It is unclear how damages were calculated and what basis existed for the differentiation between the defendants in damages allocation. Defendants filed post-trial motions for directed verdict, judgment notwithstanding the verdict and for a new trial. The district court denied all of defendants' post-trial motions and this appeal ensued.

## II. LIABILITY

Under 18 U.S.C. § 1962(c), it is unlawful:

for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

The terms "enterprise," "person," "racketeering activity," and "pattern of racketeering activity" are defined in 18 U.S.C. § 1961, as follows:

(1) "racketeering activity" means ... (B) any act which is indictable under any of the following provisions of [18 U.S.C.]: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)....

....

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity,....

A private right of action is provided for a person injured in his business or property by reason of a RICO violation. 18 U.S.C. § 1964(c).

On appeal appellants raise several questions regarding civil RICO liability: (1) did the judge instruct the jury properly on the evidentiary standard; (2) have plaintiffs differentiated between liable "persons" and the RICO "enterprise"; (3) have plaintiffs proven the existence of a RICO "pattern"; and (4) is Krypton, an unformed corporation, a "person" liable for RICO violations.

## A. *Burden of Proof*

■ Appellants claim that the district court erred in instructing the jury that plaintiff must prove each of the predicate wire and mail fraud violations by a preponderance of the evidence. They contend that because this RICO action is premised upon federal wire and mail fraud—criminal offenses that have no corresponding private rights of action—a higher standard of proof is required. They also contend that the court should have adopted the burden of proof applicable to state law fraud actions. This is essentially the position advocated in a dissent to a RICO decision in the Ninth Circuit. *See Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522,

532–35 (9th Cir.1987) (Boochever, J., dissenting).

We reject these contentions; a preponderance standard is the appropriate standard of proof. The Supreme Court has hinted, but not held, that this is the appropriate evidentiary standard. The Court stated: "We are not at all convinced that the predicate acts must be established beyond a reasonable doubt in a proceeding under § 1964(c). In a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491, 105 S.Ct. 3275, 3282, 87 L.Ed.2d 346 (1985). Other circuits specifically addressing this issue have followed the Court's suggestion. *See Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1302 (7th Cir.1987); *Wilcox*, 815 F.2d at 531; *Cullen v. Margiotta*, 811 F.2d 698, 731 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *Armco Industrial Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 480–81 (5th Cir.1986); *United States v. Local 560, Int'l Brotherhood of Teamsters*, 780 F.2d 267, 279–80 n. 12 (3d Cir.1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). Appellants' contentions were raised, discussed and rejected in *Liquid Air*, and we are in agreement. 834 F.2d at 1301–03.

## B. *Distinguishing RICO "Persons" from the RICO "Enterprise"*

■ Appellants argue that plaintiffs' pleadings do not adequately describe the "enterprise" and the "persons" participating in the "enterprise." Only "persons" can be held liable for RICO violations; the "enterprise" itself is not liable. 18 U.S.C. § 1962(c). *See, e.g., Yellow Bus Lines, Inc. v. Local Union 639*, 839 F.2d 782 (D.C.Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988). The "person" and the "enterprise" must be separate and different entities. *See, e.g., United States v. Feldman*, 853 F.2d 648, 656 (9th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989). This distinction must be described in the pleadings. *Bennett v. Berg*, 685

F.2d 1053, 1061 (8th Cir.1982), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).

■ The pleadings in this case satisfactorily describe and distinguish the "persons" and the "enterprise." The statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). We believe the pleadings adequately state that each of the five defendants was a "person" and together they formed a racketeering "enterprise." An enterprise must be merely "an ongoing organization, formal or informal." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). In this case, Metropolitan, Palm Beach, Krypton, Levine and Feltner comprised such a group. *See also Feldman,* 853 F.2d at 655–56 (individuals and corporations can associate to create RICO "enterprise").

■ Appellant contends that the "enterprise" alleged and proven was not sufficiently distinct from the "person"—in other words, because Feltner owned 100% of the corporations, they were the equivalent of his "right arm," with whom he could not "conspire." *See United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). Such argument has no merit; the fact that Feltner owned 100% of the corporations' shares does not vitiate the fact that these corporations were separate legal entities. *See Feldman,* 853 F.2d at 656 (stating, "[i]f one corporation possesses an existence separate from its incorporator, clearly a group of corporations formed by defendant is also distinct"); *United States v. Benny,* 786

F.2d 1410 (9th Cir.), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *McCullough v. Suter,* 757 F.2d 142, 143–44 (7th Cir.1985). Clearly, the jury had ample basis to find that all defendants were collectively, the "enterprise." [4]

### C. *The Existence of a RICO "Pattern"*

■ Appellants contend that their conduct did not amount to a "pattern of racketeering activity" required for RICO liability. 18 U.S.C. § 1962(c). The statute defines "pattern of racketeering activity" as "at least two acts of racketeering activity" occurring within a ten year period. 18 U.S.C. § 1961(5). Despite the language of the statute, the Supreme Court has stated that "while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.'" *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. Instead, quoting legislative history, the Court observed that isolated incidents of "racketeering activity" do not implicate Congress' concerns about organized crime infiltrating legitimate business activity. Therefore, it repeated the language of the Senate Report stating " '[i]t is this factor of *continuity plus relationship* which combines to produce a pattern.'" *Id.* (emphasis added by Court).

The Supreme Court has heard argument on a case dealing with the "pattern" requirement and will perhaps provide additional guidance in the application of the "continuity plus relationship" test. *See H.J., Inc. v. Northwestern Bell Telephone Co.,* 829 F.2d 648 (8th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988).

In the meantime, however, we believe that the Third and Seventh Circuits have

---

4. We note that there is a split of authority as to whether the "enterprise" must have an " 'ascertainable structure,' distinct from that inherent in the pattern of racketeering activity." *United States v. Bledsoe,* 674 F.2d 647, 665 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). Such a requirement of "ascertainable structure" has been adopted in *United States v. Tillett,* 763 F.2d 628, 632 (4th Cir. 1985); *Bledsoe,* 674 F.2d at 665; *United States v. Riccobene,* 709 F.2d 214, 223–24 (3d Cir.), *cert.*

denied, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); it has been rejected in *United States v. Weinstein,* 762 F.2d 1522, 1537 n. 13 (11th Cir.), *modified,* 778 F.2d 673 (1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986); and *United States v. Bargaric,* 706 F.2d 42, 55 (2d Cir.), *cert. denied sub nom.,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983).

Because appellant has failed to raise this as a basis for reversal we need not address this troublesome issue.

correctly ascertained the Court's inclinations regarding the "pattern" requirement. "In determining whether the predicate acts are sufficiently continuous and related ... [the following factors are relevant]: the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Liquid Air*, 834 F.2d at 1304; *see Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1063 (3d Cir.1988) (stating, "a court should consider a combination of specific factors such as the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity"); *see also Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (suggesting that courts define "pattern" with the language employed in *Liquid Air* ).[5]

We believe that appellants' conduct was of a magnitude sufficient to exhibit a "pattern of racketeering activity." The jury found that each defendant had committed wire and mail fraud (except Krypton which committed only mail fraud)—9 separate acts, each constituting a "racketeering activity." All 19 plaintiffs (excluding spouses) were alleged victims of mail fraud and wire fraud.[6] Two specified individuals, two corporations and Krypton were embroiled in this scheme. The acts occurred over a period of time; the solicitations began in October 1980; the sales occurred between November 1980 and early 1981; the contract envisioned a 10–year relationship between defendants and plaintiffs.[7] We conclude that these acts, even though arguably in furtherance of a single scheme to defraud a class of investors, constituted a sufficient "pattern of racketeering activity." [8]

We also reject any contention that a "pattern" requires "multiple schemes." *See H.J., Inc.*, 829 F.2d at 650; *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149 (4th Cir.1987); *United States v. Ianniello*, 808 F.2d 184, 192 (2d Cir.1986); *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3229, 3230, 97 L.Ed.2d 736 (1987); *Bank of Amer. v. Touche Ross & Co.*, 782 F.2d 966, 971 (11th Cir.1986); *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187 (9th Cir.1987); *Calif. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1469 (9th Cir.1987); *Barticheck v. Fidelity Union Bank/First Nat. State*, 832 F.2d 36, 39 (3d Cir.1987) (pattern need not involve more than one unlawful scheme). In *Hospital Employees' Division of Local 79 v. Mercy Memorial Hospital Corp.*, 862 F.2d 606, 608–09 (6th Cir.1988) and *Hofstetter v. Fletcher*, 860 F.2d 1079 (6th Cir.1988), we have implicitly rejected a multiple scheme requirement.

We find that the scheme was significant enough to constitute a "pattern of racketeering activity," although we concede it is a close question.

## D. *Liability of Krypton*

Krypton, in its motion for a directed verdict and j.n.o.v., claimed that it could not be liable because it was not yet incorporated during the existence of the alleged scheme. The district court denied the mo-

---

**5.** We also note that some circuits have adopted a literal, and extremely lenient, interpretation of the pattern requirement: two predicate acts in a related endeavor. *See United States v. Ianniello*, 808 F.2d 184, 190 (2d Cir.1986), *cert. denied sub nom.*, 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987); *California Architectural Bldg. Products v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1469 (9th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

**6.** *See, e.g., Calif. Architectural Bldg. Prods.*, 818 F.2d at 1469 (where defendants made multiple fraudulent sales to multiple victims, activity was a "pattern"); *see also Bank of Amer.*, 782 F.2d at 971 (pattern requirement satisfied when defendants prepared false reports which they knew would be mailed to victims).

**7.** *See, e.g., Bank of Amer.*, 782 F.2d at 971 (where acts of wire and mail fraud extended over three years, the pattern requirement was satisfied).

**8.** *See, e.g., Barticheck v. Fidelity Union Bank/First Nat. State*, 832 F.2d 36, 38 (3d Cir. 1987) (investment fraud scheme involving misrepresentations to 20 investors was "pattern" of racketeering activity); *United Energy Owners Comm., Inc. v. United Energy Mngmnt.*, 837 F.2d 356 (9th Cir.1988) (single scheme, involving multiple victims, to defraud through solar energy tax shelter program met pattern requirement).

tions holding Krypton liable as a "de facto" corporation.

RICO allows parties injured by RICO violations to recover from the RICO violators, but only "persons" can violate RICO. 18 U.S.C. § 1962(c) and § 1964(c). "Person" is defined to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

Under the uncontested circumstances of this case, we hold Krypton to be entitled to a directed verdict. During all times relevant to the RICO violations, Krypton, as an entity, did not have the capacity to hold either legal or beneficial title to property. It follows that Krypton could not violate RICO because it was not a legal "person."

■ Although a de facto corporation under Ohio law can hold property, under the facts here, a de facto corporation could not have existed. *See* 11 Ohio Jur.3d, *Business Relationships* § 36 (1979) (stating, "a de facto corporation possesses all of the power and authority of a de jure corporation"). In order for a corporation to have de facto status, however, three conditions must be fulfilled: there must be: (1) a general law under which a corporation may lawfully exist; (2) a good faith attempt to organize under the law and a colorable compliance with the statutory requirements; and (3) actual use or exercise of corporate privileges. *Read v. Tidewater Coal Exchange, Inc.*, 13 Del.Ch. 195, 116 A. 898 (1922); *Society Perun v. Cleveland*, 43 Ohio St. 481, 3 N.E. 357 (1885); Henn & Alexander, *Laws of Corporations* § 140 (3d ed. 1983); 11 Ohio Jur.3d, *Business Relationships* § 40 (1979).

■ The record makes no indication that there was a good faith attempt to organize or to comply with the statutory requirements. The only evidence in the record was the two letters written on Krypton stationery and Feltner's remark that he thought he told his lawyer to incorporate Krypton. These efforts fall far short of any good faith attempt to incorporate. There is nothing else in the record to indicate that Krypton was any kind of entity

capable of holding legal or beneficial title to property.

Whatever Krypton was, it was a part of the enterprise, but it was not a "person" associated with such "enterprise." It cannot, then, be held liable, although individuals who owned and/or operated this entity may have had liability.

### III. DAMAGES

The defendants vigorously contend that the award of damages cannot stand because plaintiffs paid out, cumulatively, only $211,700 and yet were awarded nearly six times this total in actual damages. Plaintiffs simply assert that damages are not confined to the amount appellees paid in down payments, and that the purpose of the RICO statute is to punish offending defendants. Plaintiffs have failed to set out with particularity the tax adjustments and have offered little proof to indicate what reasonable return could be expected on their investment (if and when paid for).

■ Even if we accept the principle that RICO damages are designed to punish, we require plaintiffs in RICO cases to set out a reasonable and principled basis of recovery. The effective means of punishing a defendant in the civil RICO context is to apply the treble multiplier to damages established by competent proof, not based upon mere speculation and surmise.

18 U.S.C. § 1964(c) states that "Any person injured in his business or property by reason of a violation of section 1962 of the chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." We begin our consideration of the damage award with reference to the statutory standard, which, we concede is not very enlightening.

■ The measure of damages under civil RICO has been described as the harm occasioned as a result of the predicate acts of the offenders. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). A plaintiff injured by civil RICO violations deserves a

"complete recovery." *Carter v. Berger,* 777 F.2d 1173, 1176 (7th Cir.1985); *see Liquid Air,* 834 F.2d at 1310. Courts have interpreted this statute to mean that a plaintiff may recover only the "damages flowing directly from the predicate acts." *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1415 (9th Cir.1987); *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 398 (7th Cir.1984) *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *DeMent v. Abbott Capital Corp.,* 589 F.Supp. 1378, 1386 (N.D.Ind.1984). Recovery for physical injury or mental suffering is not allowed under civil RICO because it is not an injury to business or property. *See e.g. Drake v. B.F. Goodrich,* 782 F.2d 638, 644 (6th Cir.1986).

As a general rule, RICO plaintiffs are entitled only to damages to business or property proximately caused by the predicate acts. *See Haroco,* 473 U.S. at 609, 105 S.Ct. at 3292. Applying this rule to the circumstances of this case we believe that plaintiffs' damages should be limited to the amounts actually invested. Appellants indicate that plaintiffs collectively paid out to defendants only $211,700; plaintiffs do not challenge these computations.

Plaintiffs contend that the jury intended to award them expectancy or "benefit of the bargain" damages. Although in some cases expectancy damages might be appropriate, clearly they are not in this case. One district court case is especially illustrative of this point. In *Heinhold v. Perlstein,* 651 F.Supp. 1410 (E.D.Pa.1987), the court dismissed a case because the plaintiff failed to show how defendant's conduct caused him any injury. Plaintiffs similarly have failed here. The conduct of the defendants in the case at bar caused the parties to invest in the films but it did not cause the investment items to become less profitable than defendants represented. As in *Heinhold,* the fraud could not simultaneously induce plaintiffs to invest and reduce the value of the investment's object. There was ample warning about risks involved, particularly tax hazards, therefore, expectancy damages are not recoverable under these circumstances. In

addition, there was no realistic evidence presented as to a reasonable value or estimate of lost profits or of the "bargain" based on analogy, experience, or practice.

Plaintiffs also contend that they are entitled to future tax benefits and the penalties associated with the IRS actions against them. Once again, we cannot say that these expenses were caused by the illegal predicate acts. Appellants' fraudulent conduct was confined to representations of the value of the films sold to plaintiffs. Parties remain "free to arrange [their] financial affairs to minimize [their] tax liability," *Stranahan v. Commissioner,* 472 F.2d 867, 869 (6th Cir.1973), and plaintiffs were not mislead about tax consequences, particularly, Donald Forrester, the C.P.A. The evidence unequivocally indicates that plaintiffs were truthfully advised of the risks associated with the investment's tax treatment. This case is very different from *Hofstetter v. Fletcher,* 860 F.2d 1079 (6th Cir.1988), in which the fraudulent acts were representations, which defendants knew were false, that plaintiffs could eliminate their federal tax liability by purchasing a life insurance policy in conjunction with the formation of a home-based business and deducting household expenses as business expenses.

During closing argument before the jury, plaintiffs asserted that they were entitled to damages for "everything they had to go through and are still going through" as a result of the alleged wrongdoing. To the extent that this was an invitation for physical injury or mental suffering, it was improper; these damages are not allowed under RICO because they are not injuries to business or property. *Drake v. B.F. Goodrich Co.,* 782 F.2d 638, 644 (6th Cir.1986).

After addressing the extent of plaintiffs' damages, appellants contend that damages should be reduced by the amount of tax benefits plaintiffs received. We disagree. In *Randall v. Loftgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), the Supreme Court held, in a securities case, that the rescissory recovery

should not be reduced by tax benefits received from a tax shelter investment. The court articulated several reasons for its decision. First, tax benefits are not "income." The securities law at issue stated that the amount of recovery would be consideration paid less income received. *See id.* at 651–52, 658, 106 S.Ct. at 347–48, 3151; 15 U.S.C. § 77*l*(2). This factor is not specifically relevant in the RICO context. Second, however, at common law tax benefits were not a direct product of the security. *Randall,* 478 U.S. at 658, 106 S.Ct. at 3151. And third, the statute seeks rescission plus deterrence, therefore, denying defendants the benefit of offsetting tax benefits generated by their illegal offering is an appropriate result. *See also Freschi v. Grand Coal Venture,* 767 F.2d 1041 (2d Cir.1985); *vacated,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731, *on remand,* 800 F.2d 305, *reconsidered,* 806 F.2d 17 (Supreme Court remanded to determine tax question in light of *Randall* and *Sedima*). Plaintiffs' award should not be reduced by tax benefits, if any, received.

 Finally, the district court also erred in instructing the jury to award damages against each defendant separately and individually. Although there is little direct law on this point, there are numerous RICO criminal forfeiture cases which indicate that the nature of the RICO offense mandates joint and several liability. *See United States v. Caporale,* 806 F.2d 1487, 1506–09 (11th Cir.1986), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987); *United States v. Benevento,* 663 F.Supp. 1115, 1118–19 (S.D.N.Y.1987), 836 F.2d 129 (2d Cir.1988); *see also Beneficial*

*Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271, 272 (9th Cir.1988) (civil RICO liability assessed joint and severally); *cf., Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 638–46, 101 S.Ct. 2061, 2065–70, 68 L.Ed.2d 500 (1981) (no right to contribution implied under Sherman or Clayton Act); *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 86–99, 101 S.Ct. 1571, 1577–80, 67 L.Ed.2d 750 (1981) (no right to contribution implied under Equal Pay Act or Title VII); *Miller v. Affiliated Financial Corp.,* 624 F.Supp. 1003, 1004 (N.D.Ill.1985) (contribution is not available as to RICO liability, relying on *Texas Industries* and *Northwest Airlines*). Defendants all participated in the "enterprise" responsible for the RICO violations; awarding damages separately between each plaintiff and defendant is inconsistent with the nature of the injury appellants inflicted and brings about a danger of multiplying damages before they are trebled.[9]

## CONCLUSION

We AFFIRM the jury's verdict on all liability issues with the exception of Krypton. We REVERSE the judgment as to Krypton. We also REVERSE the damages determination; plaintiffs are entitled to damages, assessed jointly and severally against defendants, equal to their investment in the program, in the amount of $211,700. Based on RICO principles, this award will be trebled, the amounts to be allocated based on the schedule attached reflecting the total payments made by each plaintiff.

## APPENDIX

| | Purchase Price/ Down Payment Due | Actual Down Payment Made | Tax Audit | Tax Treatment | Damage Awards (without trebling) (R. 61) | | |
|---|---|---|---|---|---|---|---|
| Plaintiff/Transcript Testimony | | | | | Damages Against C. Elvin Feltner, Jr. | Damages Against Each of Other 4 Defendants (separately) | Total Damages Against All Defendants |
| 1. Natividad Aumentado (Tr. 1096–1097) (stipulation) | $65,000/ $12,500 | $6,000 | yes | received benefits; after audit $3,578 in interest & penalties paid | $10,048 | + $2,512 × 4 = | $20,096 |

**9.** It is an interesting question as to whether the award to Fleischhauer should be reduced by the commissions he received. Upon reflection, we conclude that Fleischhauer may be compensated for the time he spent promoting the program on the theory that loss to his time was damage to his business induced by defendants' conduct.

| Plaintiff/Transcript Testimony | Purchase Price/ Down Payment Due | Actual Down Payment Made | Tax Audit | Tax Treatment | Damage Awards (without trebling) (R. 61) | | |
|---|---|---|---|---|---|---|---|
| | | | | | Damages Against C. Elvin Feltner, Jr. | Damages Against Each of Other 4 Defendants (separately) | Total Damages Against All Defendants |
| 2. Ken W. Chambers (Tr. 921–931) | 65,000/ 12,500 | 5,000 | yes | received benefits; audit pending | 26,929 | + 6,732 × 4 | = 53,857 |
| 3. Gordon M. Earle (Tr. 199–253) | 350,500/ 68,000 | $35,000 (Tr. 233, 240) | yes | received benefits, total tax savings unknown (Tr. 241–245, 248); after audit approximately $35,000 owed (Tr. 212–215, 240) | 43,166 | + 10,792 × 4 | = 86,334 |
| 4. Harry E. Fleishchhauer [1] (Tr. 628–697) (Tr. 840–869) (Tr. 873–921) | 129,800 [2]/ 8,600 [3] | 200 (Tr. 484) | yes | $38,998 in benefits received; after audit $26,000 tax, $25,000 interest, $3,000 penalty paid (Tr. 910, 919–20) | 28,378 | + 7,094 × 4 | = 56,754 |
| 5. Bruce I. Forrester (Tr. 942–989) | $65,000/ $10,000 (Tr. 964) | $1,500 | yes | $50,00 in benefits received; after audit $50,000 in interest & penalties paid [4] (Tr. 965–966) | $14,833 | + $3,708 × 4 | = $29,665 |
| 6. Donald Forrester (Tr. 1048–1052) (Tr. 1064–1095) | 162,500/ 2,500 | –0– | yes | $97,500 in benefits received; audit pending with potential payment due of $100,000 | 85,732 | + 21,433 × 4 | = 171,464 |
| 7. Kathleen D. Forrester (Tr. 989–991) | 130,000/ 20,000 (Tr. 964) | 3,000 | yes | see Bruce Forrester [4] | 17,166 | + 4,291 × 4 | = 34,330 |
| 8. Robert P. Gill (Tr. 1008–1015) | 65,000/ 12,500 | 12,500 | no | received benefits; in excess of $12,500 cash net profit (Tr. 1013–1014) | 37,742 | + 9,436 × 4 | = 75,486 |
| 9. Dennis M. Harrington (Tr. 991–998) | 65,000/ 12,500 | 5,000 | yes | received benefits; after audit $29,000 tax including $14,000 to $15,000 interest & penalties paid | 14,488 | + 3,622 × 4 | = 28,976 |
| 10. Roger Houston (Tr. 608–628) | 130,000/ 25,000 | 25,000 | yes | $42,000 in benefits received; after audit $34,000 taxes, interest & penalties paid | 41,878 | + 10,469 × 4 | = 83,754 |

**1.** Received commissions on all sales to plaintiffs and others in the amount of $55,858 (JTX–62) (Tr. 1288).

**2.** Stipulation (Tr. 51).

**3.** Balance of $8200 to be paid through offset on commissions due (JTX–115).

**4.** Joint return filed in 1980 for Bruce Forrester and Kathleen Forrester per the former (Tr. 964–965), and separate return per the latter (Tr. 911).

| Plaintiff/Transcript Testimony | Purchase Price/Down Payment Due | Actual Down Payment Made | Tax Audit | Tax Treatment | Damage Awards (without trebling) (R. 61) | | |
|---|---|---|---|---|---|---|---|
| | | | | | Damages Against C. Elvin Feltner, Jr. | Damages Against Each of Other 4 Defendants (separately) | Total Damages Against All Defendants |
| 11. Charles E. Judd dba C.B. Judd & Associates (Tr. 1098–1098) (stipulation) | 65,000/ 10,000 | 5,000 | no | received benefits | 26,929 | + 6,732 × 4 | = 53,857 |
| 12. C.T. Lee (Tr. 1099–1100) (stipulation) | 65,000/ 12,500 | 12,500 | yes | received benefits; after audit benefits disallowed | 32,239 | + 8,060 × 4 | = 64,479 |
| 13. Robert & Ona Louise Mournighan (Tr. 490–508) (Tr. 512–547) | 97,450 [2] 18,750 | 6,000 (Tr. 523) | no | $20,000 in federal tax benefits received (Tr. 537) | 28,394 | + 7,098 × 4 | = 56,786 |
| 14. Charles Mueller (Tr. 931–942) | 65,000/ 12,500 | 6,000 | yes | received benefits; after audit $32,000 taxes, interest + penalties paid | 24,259 | + 6,065 × 4 | = 48,519 |
| 15. James Ralph (Tr. 547–585) | 65,000/ 12,500 | 12,500 | yes | $24,000 in benefits received; after audit $24,000 tax, $19,200 interest, $1,000 penalty paid (Tr. 583–584) | 39,904 | + 9,226 × 4 | = 76,808 |
| 16. REF Productions Ltd. (Tr. 1015–1048) | $260,000/ $50,000 | $35,000 [5] | yes | received benefits; after audit $151,000 tax and $58,000 in interest + penalties paid to IRS & $13,662 KY tax [6] | $82,747 | + $20,687 × 4 | = $165,495 |
| 17. Joseph Reisinger (Tr. 585–608) | 65,000/ 12,500 | 12,500 | no | $15,000 in benefits received (in excess of payments) (Tr. 607) | 36,904 | + 9,226 × 4 | = 73,808 |
| 18. Louis B. Updegrove (Tr. 1052–1064) | 45,500/ 8,750 | 4,000 | no | received benefits in excess of $4,000 | 25,516 | + 6,379 × 4 | = 51,032 |
| 19. Daniel E. & Carol Ann Wright (Tr. 998–1008) (Tr. 253–319) | 130,000/ 25,000 | 25,000 | yes | received benefits; after audit $46,000 paid to IRS of which $18,000 was interest (Tr. 293) | 42,809 | + 10,702 × 4 | = 85,617 |
| TOTALS | $2,085,750 $346,600 | $211,700 | 14 yes/ no | | $660,061 | + $164,264 × 4 | = $1,317,117 |

**5.** Paid $25,000 by Charles Eppling and $10,000 by George Renker (nothing paid by REF or Donald Forrester) (Tr. 1036).

**6.** No tax paid by REF or by Donald Forrester as general partner, Charles Eppling paid $106,668 and George Renker paid $113,114 to IRS.

## SUPPLEMENTAL OPINION

In our original opinion in this case, we affirmed the jury's verdict on liability issues, with the exception of Krypton Corporation's liability which we reversed, and we reversed the damages determination finding that the evidence could not support the amount of damages the jury awarded. We held that in civil actions under the Racketeer Influenced Corrupt Organizations Act, a successful plaintiff is "entitled to damages to business or property proximately caused by the predicate acts," assessed jointly and severally. Under the evidence introduced at that trial, we concluded that the plaintiffs were entitled, for the most part, to recover the "amounts actually invested," subject to trebling. To assist the district court in modifying its judgment on remand, we attached to the opinion, as an Appendix, a chart summarizing the evidence presented relating to these amounts.

Appellees filed a motion for rehearing on July 11, 1989, to which this court requested a response from appellants. A response was filed on July 28, 1989. Appellees asked the panel to reconsider some of the Appendix entries in light of information in the transcript not previously brought to the attention of the panel. Appellants conceded several of appellees' objections in their response.

In light of appellants' concessions and our evaluation of the other points raised in appellees' motion to reconsider, we amend the Appendix of the opinion to reflect the following payments several of the appellees made to Southwest Capital Corporation. The following appellees should be credited with having paid the amounts in parentheses following their names in addition to the amounts reflected in the Appendix: Bruce I. Forrester ($254); Dennis M. Harrington ($630); Roger Houston ($1,416); Charles Mueller ($600); Daniel E. & Carol Ann Wright ($410); and Joseph Reisinger ($210).

Appellees also contest the amount of down payments made by Bruce I. Forrester and Kathleen D. Forrester. The precise amounts of their down payments should be determined by the district court on remand.

In all other respects the Court's opinion is AFFIRMED.