### In re TUCKER FREIGHT LINES, INC., Debtor.

John COLE, Donna Zachary, Eva Kolski, Al Mynsberge, Billy Thomas, Truman Meyers, Robert Buker, Glen Cruey, Howard Hett, Dwight England, Marlene Sheldon, Gray Goad, J.L. Ahl, Harold Ahlson, Leroy Anderson, Robert F. Anderson, Junior R. Arnt, Frederick M. Artibee, D.E. Atkinson, Edward Aubery, Donald R. Benjamin, F.L. Bridgeman, W.H. Brines, J.R. Bryers, K.C. Butzen, M.D. Caldwell, Shirley Carothers, Kathleen Cartwright, E.L. Craft, C. Cromwell, J.H. Crowder, Francis Lawrence Currie, Arlene Cwidak, W.F. Davis, F.C. DeJong, Willadean C. Delaney, Ronald L. Dickson, Robert H. Duncan, O.D. Elam, Jean M. Evans, Eugene J. Flock, James Forrest, Mary Galan, Donald Gersch, Charles R. Gnoth, A.J. Goldsmith, Rudy G. Gonzalez, N. Goodman, M.K. Gordon, Lucille M. Green, Errol L. Greer, D. Gregory, R. Hadaway, C.T. Haley, J. Harrington, Teddie K. Harrison, Russell C. Hay, Herschel Heavener, Ralph E. Heavener, K.M. Heick, John D. Helms, William L. Hemmer, J. Hernandez, F.B. Hewitt, Shirley Hiner, D.A. Hipp, Roger Horton, H.F. Irwin, A.E. Jeffries, A.O. Johnson, D.J. Johnson, E.R. Johnson, H. Johnson, Lyle D. Johnson, V.E. Jones, H.J. Jozwiak, L. Keefe, E.H. Kimbel, J. Kinney, George H. Kraus, J.W. Layman, Raymond A. Lee, Robert Leggett, Billie Lemanski, J. Liss, J.M. Lopez, R.T. Loutzenhiser, Eugene Lucier, D.A. Mackowiak, Marcia A. Mahoney, Alfred Mainwaring, F.D. Mason, Walter Mattiford, G.R. McClelland, Gail Meek, R.L. Melser, W.E. Merrill, David Mikesell, J.E. Milcarek, G.V. Miller, Benancia V. Negrete, J.P. Noto, M. Paredes, LaVern M. Parks, L.R. Parmley, R.L. Parmley, R. Parmley, S.S. Peck, O.W. Perkins, Harold J. Peterson, James A. Pickett, Wymann D. Pittman, Ronald J. Pondelicek, J.A. Potere, Marion Prewitt, R.D. Pritchert, Sharon Rajski, Esther Ratajczak, F.D. Right, George J. Roulo, Michael Rouse, Ted Lee Runyan, Paul M. Sanders, R.L. Shoen, H.D. Shipp, Paul Sisson, V.K. Smith, Phyllis S. Solomon, M. Spears, J.W. Spelts, Donald Stein, Benny A. Stewart, J. Stewart, Raymond V. Stout, Don L. Swinehart, Bobby J. Tabor, Samuel C. Tatum, R. Thieren, F. Vasquez, Donald C. Walls, H.W. Walters, Roy A. Ward, Virgil Ward, Jr., Casimir Wegzyn, Richard M. Wesner, Stewart E. White, Cherle A. Wilks, Donald Williamson, James D. Wiltrout, J.C. Zuffante, and all others similarly situated, Plaintiffs,

v.

John WALHOUT, as Trustee of Tucker Freight Lines, Inc., Samuel Raitzin, Shirley Raitzin, Albert Baker, Jay Chodock, Jordon Kapson, Raymond Hoffman, Dale McColley, Frances Tucker, Julius L. Tucker, Richard Rosenthal, Jack Clemans, Arthur Schlifke, Howard Weinraub, Carey Bert, John Kolhoven, Barry Gordon, Central Transport, Inc., Larry Mason, Hal Briand, T.J. Moroun, M.J. Moroun, A.A. Moroun, V.M. Baks, F.M. McBrien, and Ronald W. Lech, Defendants.

No. G88–41–CA1.

United States District Court, W.D. Michigan, S.D.

Aug. 2, 1991.

886

Cynthia S. Gillard, Randall G. Hesser, Warrick, Weaver & Boyn, Elkhart, Ind., for plaintiff.

Daniel F. Berry, Michael A. Nedelman, Simpson & Moran, Birmingham, Mich., David Murphy, Pepper, Hamilton & Scheetz, Detroit, Mich., William I. Kohn, Lynn C. Tyler, Joseph W. Rebone, Barnes & Thornburg, South Bend, Ind., Gregory G. St. Arnauld, Deming, Hughey, Lewis, Keiser, Allen & Chapman, Kalamazoo, Mich., for defendants.

OPINION AND ORDER ON DEFEN-
DANTS' MOTION FOR DISMISSAL
AND/OR SUMMARY JUDGMENT

MILES, Senior District Judge.

Plaintiffs' claims arise out of the financial difficulties and eventual bankruptcy of Tucker Freight Lines, Inc. ("Tucker"). Plaintiffs are former employees of Tucker who entered into wage deferral contracts to save the company from its eventual demise. They claim that those contracts constitute "securities" within the meaning of the Securities Act of 1933, 15 U.S.C.A. §§ 77a—77aa (West 1981), and the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78a—78kk (West 1981), and allege that the defendants violated those statutes. In the alternative, plaintiffs claim that the wage deferral contracts constitute "employee pension benefit plans" and/or "pension plans" within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L. No. 93–406, 88 Stat. 829 (codified as amended in scattered sections of Titles 5, 18, 26, and 29 U.S.C.), and allege that the defendants violated that statute. Plaintiffs also allege that the defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1962 (West 1984), the Interstate Commerce Act, 49 U.S.C.A. § 11301 (West 1990), and the common laws of fraud and securities laws of several states.

Defendants have moved for dismissal of or summary judgment on all claims, and argue that the wage deferral contracts were not "securities," "employee pension benefit plans," or "pension plans." Thus, they argue that they did not violate the securities laws, ERISA, or the Interstate Commerce Act, and, therefore, that they have not committed predicate acts necessary for a RICO violation. Finally, they urge this Court to dismiss plaintiffs' pendent state law claims. The Court grants defendants' motion to dismiss this case.

### FACTS

Plaintiffs have alleged the following facts, which the Court accepts as true for purposes of dismissal under Fed.R.Civ.P. 12(b)(6). *Neitzke v. Williams,* 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Great Lakes Steel, Div. of Nat'l Steel v. Deggendorf,* 716 F.2d 1101 (6th Cir.1983). In 1981, Tucker notified its employees that the company was "sick—*real and seriously sick,*" and asked them to allow it to deduct 6% from their paychecks. Tucker explained that this deduction would be considered a "contribution ...—*not as a loan.*" In 1982, Tucker again requested help from its employees. This time, it asked to deduct 15% from their paychecks, and stated that it would accrue each employee's deductions, and pay each employee back gradually, without interest, as the company reached certain levels of profit. In 1983, Tucker repeated its 1982 request.

When Tucker solicited its employees, it misrepresented that it would again earn profits and that the employees would receive their deferred wages regardless of what happened to the company. In fact, it knew that bankruptcy was likely. In response to each request, employees allowed Tucker to deduct the requested amounts. Tucker used the deductions made in 1981 and 1982 as working capital, and allegedly used the deductions made in 1983 for the same purpose.

On September 15, 1983, Central Transport, Inc. ("Central") acquired 100% of the stock of Tucker. Central is itself a subsidiary of Centra, Inc. ("Centra"). The next day, Central caused Tucker to file for reorganization under Chapter 11 of the Bankruptcy Code. During reorganization, Tucker continued to deduct amounts from employees' paychecks. Eventually, the proceeding for reorganization under Chapter 11 of the Bankruptcy Code was changed to a proceeding for liquidation under Chapter 7.

### DISCUSSION

#### I. Securities

To sustain their claims under the federal securities acts and the Interstate Commerce Act, the plaintiffs must allege transactions involving securities. 15 U.S.C.A. § 77b(1) presents the definition of security for the Securities Act of 1933, which for

these purposes is considered to be the same as the definition for the 1934 Act, *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990):

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security". . . .

Plaintiffs argue that the wage deferral contracts are either "investment contract[s]," or debt instruments such as "note[s]" or "evidence[s] of indebtedness."

### A. *Investment Contract*

■■■ A contract is not an investment contract unless the person parting with his money expects to receive profit. The Supreme Court, in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946), defined an investment contract as a "scheme [that] involves an investment of money in a common enterprise with profits to come solely from the efforts of others." The Court elaborated on that definition in *United Housing Foundation v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975):

> By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in [*SEC v. C.M.*] *Joiner*, [320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943)] (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight*, [389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)] (dividends on the investment based on savings and loan association's profits).

Since the plaintiffs did not even expect the payment of interest, they cannot reasonably argue that they expected capital appreciation. Instead, they argue that they expected to participate in the earnings of the company through future wages made possible by deferring part of their wages.

However, future wages are not a participation in earnings because they are received for additional work rather than passively. The Court in *Forman* described the profits realized from participating in earnings as "returns on . . . investments." *Id.* 421 U.S. at 853, 95 S.Ct. at 2061. The word "return" connotes a passive profit rather than earnings. Neither is the *opportunity* to earn wages a participation in earnings because such an opportunity must be further developed. "[W]hen a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or to develop it themselves,' as the *Howey* Court put it . . .—the securities laws do not apply." *Id.* Like the loan in *Cocklereece v. Moran*, 532 F.Supp. 519 (N.D.Ga.1982), the opportunity to earn wages is merely something to be used to earn profit rather than profit itself.

### B. *Note or Evidence of Indebtedness*

■■■ Although the wage deferral contracts were called "promissory obligations," they were neither notes nor evidences of indebtedness under the securities laws because such debt instruments also induce a reasonable expectation of profit. In *Reves*, the Supreme Court outlined the method for determining whether an instrument called a note was a note for purposes of the securities laws. (The Court's method seems applicable to all debt instruments, including evidences of indebtedness.) First, a court should decide whether the instrument at issue "bears a strong resemblance" to one of the debt instruments that the Second Circuit has decided are not securities. 110 S.Ct. at 952. If it does not, as here,[1] the court should consider four

---

1. The wage deferral plans do not resemble "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business. . . ." *Exchange Nat'l Bank v.*

factors. The first is dispositive for this Court: "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]." *Id.* at 951. Unlike "the buyer [who] is interested primarily in the profit the note is expected to generate," *Id.* at 951–52, the plaintiffs here expected no profit.

Although the Supreme Court defined profit more expansively when it considered notes in *Reves* than when it considered investment contracts in *Howey*, profit is at least " 'a valuable return on an investment' " *Id.* 110 S.Ct. at 952 n. 4. Furthermore, the Court in *Reves* emphasized that "Congress' purpose in enacting the securities laws was to regulate *investments*," *Id.* at 949, again connoting passive profit rather than earnings.

Plaintiffs' reliance on *Harris v. Republic Airlines, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 93,-772, 1988 WL 56256 (1988) is misplaced because the plaintiff employees in that case believed that they could enjoy profit from the wages that they deferred. The plans in that case provided that when the company made a profit, the employees could receive more than the wages that they had deferred. They were to receive 25% of the first $60 million in profit and 50% of any profit above $60 million.

### C. *Interstate Commerce Act*

■ 49 U.S.C.A. § 11301(b)(1), made applicable to trucking companies like Tucker by 49 U.S.C.A. § 11302 (repealed effective Nov. 19, 1982), requires carriers to obtain approval from the Interstate Commerce Commission before they issue securities. However, the test for a security under that section has been interpreted as similar to the test under the securities acts. *Ass'n of Am. Railroads v. United States,* 603 F.2d 953 (D.C.Cir.1979). Thus, since the wage deferral contracts are not securities under the securities acts, they are not securities under the Interstate Commerce Act. In fact, as noted by the court in *United States*

*v. New York, New Haven & Hartford Railroad,* 276 F.2d 525 (2d Cir.1959), the definition of security in the Interstate Commerce Act is less broad than the definition in the securities acts.[2] Only instruments that are "of like kind to stocks or bonds" are securities under section 11301. *Ass'n of Am. Railroads,* 603 F.2d at 964. Stocks and bonds provide passive returns, which the wage deferral contracts certainly do not provide.

## II. ERISA

To sustain their claims under ERISA, the plaintiffs must allege transactions involving employee benefit plans. 29 U.S.C.A. § 1002(3) defines that term:

> The term "employee benefit plan" or "plan" means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

The plaintiffs assert that the wage deferral contracts are both "employee welfare benefit plans" and "employee pension benefit plans."

### A. *Employee Welfare Plan*

■ An employee welfare benefit plan is:

> any plan, fund, or program which ... is ... established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained *for the purpose* of providing for its participants or their beneficiaries ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services....

29 U.S.C. § 1002(1) (emphasis supplied). Tucker promised to pay each employee the

---

*Touche Ross & Co.,* 544 F.2d 1126, 1138 (2nd Cir.1976). Neither do they resemble "a note evidencing a loan made by a commercial bank to finance current operations of a borrower." *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2nd Cir.1984).

**2.** " '[S]ecurity' means a share of capital stock, a bond, or other evidence of interest in, or indebtedness of, a carrier." 49 U.S.C.A. § 11301(a)(2).

wages deferred either when the company earned a certain level of profits, or, if an employee left the company or died before the company reached that level, when the employee left or died. However, the wage deferral contracts were not employee benefit plans because the purpose of payment at departure or death was not to help the employee face unemployment or to help his family survive his death. Rather, the purpose was merely to repay the loan from the employee early since that employee would not be present when the company became profitable.

■ ERISA does not cover all employer obligations that could come due at or after departure or death, but only those intended to provide income in such circumstances. The court in *Murphy v. Inexco Oil Co.*, 611 F.2d 570 (5th Cir.1980) focused on the purpose of the plans in that case to determine that they were not employee welfare benefit plans. The plans obligated the employer to pay its employees royalties from a drilling prospect. Although the payments were "likely to continue after the employee [had] retired or ceased work because of death or disability," the court was not satisfied. *Id.* at 574. It held:

> The statute does not embrace all plans that may incidentally result in the payment of benefits after death or disability but only plans established for the purpose of providing those benefits.

*Id.*

### B. *Employee Pension Plan*

■ An employee pension benefit plan is:

> any plan, fund, or program which ... is ... established or maintained by an employer ... to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond ...

29 U.S.C.A. § 1002(2)(A). The plaintiffs' arguments for construing the wage deferral contracts as employee pension benefit plans are similar to their argument for construing them as employee welfare benefit plans. Since the plans could be paid at retirement, they could "provide retirement income." At least, plaintiffs argue, the plans could "result in a deferral of income ... to the termination of covered employment."

However, plans only provide retirement income if their purpose is to provide such income, and such was not the purpose of the wage deferral contracts. Mere payment during retirement is not enough, especially if the payment is for identified benefits received by the employer for which it has not paid anything previously. As stated the court in *Murphy:*

> The words "provides retirement income" patently refer only to plans designed for the purpose of paying retirement income whether as a result of their express terms or surrounding circumstances.

611 F.2d at 575. Likewise, the court in *Fraver v. North Carolina Farm Bureau Mutual Insurance*, 801 F.2d 675 (4th Cir. 1986) declined to hold that an insurance company's obligation to pay its agent a fixed amount of money for the first five years of his retirement was an employee pension benefit plan. The purposes of the obligation were merely to pay a final commission for work performed and to pay the agent for the business that he left with the company. Similarly, the purpose of Tucker's obligation was to repay wages specified as earned but not yet paid.

Furthermore, plans only result in a deferral of income *to termination of employment* if their purpose is to so defer income, and such was not the purpose of the wage deferral contracts. This Court discerns no reason that courts would identify purpose as a characteristic of covered plans under one part of subparagraph (A) and not under another. Furthermore, that subparagraph describes pension plans, which plans are commonly understood to be motivated by a purpose to provide retirement income rather than a purpose merely to repay a debt. The clear purpose

of the wage deferral contracts was to defer payment only until Tucker reached a certain level of profit rather than to defer payment until termination.

The Court believes that its decision is consistent with the language of subparagraph (A) stating that a plan may provide retirement income or result in a deferral of income as a result of surrounding circumstances. As indicated by the court in *Murphy,* that language means merely that circumstances will sometimes indicate that the purpose of the plan is to provide for retirement even when the parties do not expressly state the plan's purpose. It does not expand the coverage of ERISA to all plans under which payments could be made during retirement.

## III. RICO

■ To sustain their claims under RICO, the plaintiffs must allege that they were harmed by some defendant's prohibited interaction with an enterprise. 18 U.S.C.A. § 1964(c) provides a remedy for persons "injured in ... business or property by reason of a violation of section 1962 of this chapter." In turn, three subsections of section 1962 prohibit various interactions with enterprises through patterns of racketeering activity. Plaintiffs allege that Tucker or the persons controlling it engaged in a pattern of racketeering activity: numerous acts of mail fraud. They further allege that Tucker or the other defendants invested the proceeds of such activity in Tucker or an association of Tucker, Central and Centra, that they maintained an interest in and control over Tucker or the association through such activity, and that they conducted or participated in the affairs of Tucker or the association through such activity.

### A. *Section 1962(a)*

Subsection (a) reads, in relevant part: It shall be unlawful for any person who has received any income ... from a pattern of racketeering activity ... *to use or invest* ... any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the

activities of which affect, interstate or foreign commerce. [Emphasis supplied.]

The plaintiffs allege that Tucker or its controlling agents violated subsection (a) by investing in Tucker or the association of Tucker, Central and Centra. Several courts have held that an entity violates this subsection when it invests the proceeds of its racketeering activity in itself. *See Official Publications v. Kable News Co.,* 884 F.2d 664 (2d Cir.1989); *Shearin v. E.F. Hutton Group,* 885 F.2d 1162 (3rd Cir. 1989); *Schreiber Distributing Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393 (9th Cir.1986); and *Masi v. Ford City Bank & Trust Co.,* 779 F.2d 397 (7th Cir.1985); *but see Hemmings v. Barian,* 822 F.2d 688, 692 (7th Cir.1987) (Under subsection (a), "[t]here must ... be investment ... in *another* enterprise.") (emphasis supplied).

Regardless, the plaintiffs are not entitled to relief for a violation of subsection (a) because the complaint demonstrates that they were not injured by investment in Tucker or the association. As noted previously, section 1964(c) provides a remedy only for injury from violations of section 1962, and the violation of section 1962(a) is the investment or use of racketeering proceeds rather than the racketeering itself. Therefore, under subsection (a), plaintiffs must sufficiently allege an injury from the use or investment of racketeering income. *Old Time Enterprises v. International Coffee Corp.,* 862 F.2d 1213 (5th Cir.1989); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147 (10th Cir.1989); *Cincinnati Gas & Electric Co. v. General Electric Co.,* 656 F.Supp. 49 (S.D.Ohio 1986). The Supreme Court opinion in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) does not compel a contrary conclusion. The Court merely held that plaintiffs need allege no "racketeering injury" apart from the injury that the statute expressly requires. In *Sedima,* the Court was considering subsection (c), which is violated by predicate acts of racketeering in the conduct of an enterprise. Therefore, under that subsection, "the compensable injury [from its violation] necessarily is the harm caused by predicate acts." *Id.* at

497, 105 S.Ct. at 3285. However, the Court explicitly noted:

> Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is mere commission of the predicate offenses. In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.

*Id.* at 495, 105 S.Ct. at 3284.

The injuries plaintiffs allege clearly are the losses of wages. Those losses were caused most immediately by the defendants' fraud rather than those defendants' subsequent investment of the proceeds. Furthermore, the investment did not cause subsequent losses merely by prolonging the existence of Tucker because Tucker's continued existence benefited the plaintiffs. One usually does not think of mere investment in a corporation or other enterprise as a cause of subsequent losses more immediately caused by the enterprise itself. However, in *Newmyer v. Philatelic Leasing,* 888 F.2d 385 (6th Cir.1989), the court did hold that financing a fraudulent scheme causes injury to those subsequently defrauded. However, the plaintiffs in *Newmyer* exchanged their cash for goods and services less valuable than the defendants had represented them to be, so they only suffered from the scheme. In contrast, Tucker's employees received wages that they would not have received had Tucker closed earlier than it did.

### B. *Section 1962(b)*

■ Subsection (b) reads, in relevant part:

> It shall be unlawful for any person through a pattern of racketeering activity ... *to acquire or maintain* ... any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. [Emphasis supplied.]

The plaintiffs allege that Tucker or its controlling agents maintained an interest in or control of Tucker or the association. However, as a subsidiary, Tucker maintained no interest in the association, and it logically could not maintain an interest in itself, just as "you cannot associate with yourself" for purposes of subsection (c). *McCullough v. Suter,* 757 F.2d 142, 144 (7th Cir.1985). Likewise, as a subsidiary, Tucker maintained no control of the association. Furthermore, Tucker did not maintain control of itself; the plaintiffs do not allege that Tucker staved off takeover bids before finally succumbing to the bid of Central.

### C. *Section 1962(c)*

■ Subsection (c) reads, in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct or participate ... in the conduct of such enterprise's affairs* through a pattern of racketeering activity.... [Emphasis supplied.]

The Court infers several possible allegations from the complaint. First, the plaintiffs allege that Tucker conducted the affairs of Tucker. Second, the plaintiffs allege that Tucker conducted the affairs of an association of itself and its employees. Third, the plaintiffs allege that Tucker conducted the affairs of Central or an association of Tucker, Central and Centra. Finally, the plaintiffs allege that the controlling agents of Tucker conducted the affairs of Tucker.

Tucker did not violate subsection (c) by conducting the affairs of itself because subsection (c) requires that the "person" and the "enterprise" be distinct entities. *Newmyer; Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481 (6th Cir.1989); *Fleischhauer v. Feltner,* 879 F.2d 1290 (6th Cir. 1989). Likewise, Tucker did not violate subsection (c) by conducting the affairs of an association of itself and its controlling agents. "[A]n organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself." *Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Local Union 639,* 883 F.2d 132, 141 (D.C.Cir.1989). *See also Entre Computer Centers v. FMG,* 819 F.2d 1279 (4th

Cir.1987); *Old Time Enterprises; Atkinson v. Anadarko Bank and Trust Co.,* 808 F.2d 438 (5th Cir.1987); and *Robinson v. Kidder Peabody and Co.,* 674 F.Supp. 243 (E.D.Mich.1987).

The court in *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349 (3rd Cir.1987) did hold a corporation liable under subsection (c) for conducting the affairs of an association of itself and its officers; however, that court apparently ignored the very purpose that it had attributed to that subsection.

> [Subsection (c)] was intended to govern only those instances in which an "innocent" or "passive" corporation is victimized by the RICO "persons," and either drained of its own money or used as a passive tool to extract money from third parties.

*Id.* at 1359. *See also Yellow Bus Lines,* 883 F.2d at 139 (noting that in subsection (c) Congress "target[ed] ... the exploitation and appropriation of legitimate business by corrupt individuals"). The court in *Fleischhauer* similarly held that the two officers in that case had formed an enterprise with the three corporations solely owned by one of the officers. However, the officers in that case did not merely act in their corporate capacities on behalf of the corporations in that case, as did the officers and directors in this case. Rather, they used those corporations as tools to carry out their scheme.

This Court doubts the propriety of holding that a corporation like Tucker can associate with other entities, including its parent corporation, to form an enterprise within the meaning of RICO. 18 U.S.C.A. § 1961(4) "defines" the word "enterprise":

> "[E]nterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

Thus, the drafters of the statute seem to have considered enterprises to be only legal entities or associations of *individuals,* and not corporations. Although, as noted by the court in *Atlas Pile Driving Co. v. DiCon Financial Co.,* 886 F.2d 986 (8th Cir.1989), the definition is illustrative rather than exhaustive, it likely illustrates that Congress intended to exclude associations of entities other than individuals. Furthermore, incorporating to evade liability would not necessarily be as successful as the court suggested. The court in *Fleischhauer* did not expressly address the question.

■ Regardless, Tucker did not violate subsection (c) by conducting the affairs of an association of itself, Central and Centra, nor by conducting the affairs merely of Central, because the affairs conducted were not distinct from Tucker's. Tucker merely conducted its own affairs while under the ownership of Central. The court in *Atkinson v. Anadarko Bank and Trust Co.,* 808 F.2d 438 (5th Cir.1987), held that a bank had not conducted the affairs of an association of itself, its holding company, and its employees merely by conducting its own affairs. *See also Odishelidze v. Aetna Life & Casualty Co.,* 853 F.2d 21 (1st Cir.1988) (none of the members of an association composed of a company, its subsidiaries, and its employees were distinct from the association). Thus, Tucker has not conducted the affairs of an association of itself and its parents.

If the affairs of the association were not distinct from Tucker's affairs, then the affairs of Central were not distinct. The court in *Haroco v. American National Bank & Trust,* 747 F.2d 384 (7th Cir.1984), did hold that a wholly-owned subsidiary had conducted the affairs of its parent in violation of subsection (c). However, this Court believes the implication of the courts in *Atkinson* and *Odishelidze* more sound than the holding in *Haroco.* That holding seems artificial. If a corporation is not liable for conduct on the day before another corporation buys it, no RICO policy indicates that it should be liable on the day after. Moreover, holding that a corporation that merely conducts its own affairs thereby conducts its parent's affairs, "would render the non-identity requirement of [subsection (c)] meaningless." *Yellow Bus Lines,* 883 F.2d at 141.

■ Finally, the controlling agents of Tucker did not violate subsection (c) by

conducting the affairs of Tucker because they merely acted in their corporate capacities and in the interests of the corporation. Therefore, when the defendant agents acted, the defendant Tucker was actually the actor, so the defendants were not distinct from the enterprise. The court in *Puckett* held that for purposes of subsection (c), the actions of the employees in that case were merely the actions of their corporate employer. The court stated:

> [Plaintiff's] argument on appeal is somewhat incredible, as it is apparent that, in arguing that [the corporation] acted "by and through" its employees, [plaintiff] earlier contemplated only one entity, the corporation, acting in the only manner it is possible for a corporation to act, through its employees.... Under the circumstances of this case, it is clear that [plaintiff] has alleged that [the corporation] is both the "person" and the "enterprise" for purposes of her § 1962(c) claim, and therefore her civil RICO count was properly dismissed.

889 F.2d at 1489. *See also Yellow Bus Lines* (members of a union did not violate subsection (c) by conducting the affairs of their union). Similarly, the plaintiffs here have based their claims against the officers and directors solely on the fact that they were "control persons" of Tucker. The plaintiffs do not allege that the officers and directors used the corporation merely to channel money from the plaintiffs to themselves.

### IV. State Law Claims

Since the Court dismisses all federal claims, it also dismisses the pendent state law claims. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Accordingly, IT IS HEREBY ORDERED that the defendants' motion for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED, and that the case is DISMISSED.

IT IS SO ORDERED.